**Sammie Norman ENGLISH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 62778.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 9, 1980.

Rehearing Denied Feb. 6, 1980.

Robert Montgomery, Pasadena, Tom Stansbury, Allen C. Isbell, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and Andy Tobias, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PHILLIPS, Judge.

This is an appeal from a conviction for capital murder. The punishment is death.

Appellant complains that his confession was involuntary, the court's charge to the jury was fundamentally defective, and the court improperly set aside its order granting appellant a new trial.

Appellant was arrested in Houston on May 7, 1977, after being stopped on Interstate 45 for a traffic violation. He was initially detained at the Houston Police Department and Jail on suspicion of auto theft. The next day, May 8, appellant was questioned concerning the shooting death of David Harry Samsel, in whose van appellant had been traveling when arrested. Appellant made a written statement confessing the murder of Samsel. Appellant testified at a pretrial *Jackson v. Denno* hearing that he only confessed in order to stop the physical beatings that he was receiving at the jail and to facilitate the release of his sister and his girlfriend, both of whom had been arrested with him and detained at the jail. After hearing evidence on the matter, the trial court found the confession to be voluntary. The jury reached the same conclusion at trial. On appeal appellant reurges his contention that his confession was involuntary.

According to appellant he was arrested and transported, handcuffed, to the auto theft division at the police station, where he was questioned by Houston police officers concerning the theft of the van. The officers also questioned his companions Aaron Powell and Kyle McGill, his sister Mary Lynn Reynolds, and his girlfriend Wendolin Moseley. Appellant testified that when the officers searched his sister in his presence, he told them to leave her alone. In response one officer named Bryan knocked him down, and several officers beat him. He was subsequently taken to the holding tank, prior to being booked in at the jail.

Upon being taken out of the holding tank appellant was photographed and searched. According to appellant, as he was reaching for his shoes to put them on after the search, an officer kicked him in the hand and hit him in the eye, and then several officers beat him and stood on his neck. They took him to the jail on the fifth floor and placed him in an isolation cell, still handcuffed. Appellant testified that officers came in the cell and beat him for a period of three days. Appellant testified that soon after he was placed in the isolation cell officers came in, beat him, and put a belt around his neck so that his skin was scraped off. After two days of beatings he saw Detective J. L. Bonds, who told him that if he would sign a confession Bonds would keep the officers from beating him. Under appellant's account, he signed the confession to stop the beatings and to get his sister and girlfriend out of jail.

Houston Police Officers D. B. Osterberg and T. L. Maines testified that they arrested appellant at 2:55 a. m. on May 7, 1977. Both testified that appellant was belligerent, used abusive language, and seemed prone to violent conduct. The officers handcuffed appellant and took him to the auto theft division at the police station. There Maines read appellant his rights and questioned appellant regarding the theft of the van. Maines testified that when he questioned appellant's sister, appellant became violent and threatened to "whip his ass." In response Maines told appellant to be quiet and sit down. Maines testified that no physical violence was used against appellant in his presence.

Osterberg testified that appellant was belligerent at the auto theft division, refused to sit down in a chair, and kicked at him when he tried to get appellant to sit down. Officer W. M. Bryan, who assisted Osterberg at the auto theft division, testified at trial that appellant cursed the officers and expressed a desire to fight them. Appellant refused to sit down in a chair and finally was forced by the officers to sit on the floor.

After questioning appellant the officers took him to the holding tank and removed his handcuffs. Appellant was held there before being booked into jail on the fifth floor. Officer L. L. Hillman testified that appellant argued with other prisoners in the holding tank and was uncooperative when the officers searched him before taking him to the fifth floor. Officer W. D. Chapman told appellant to sit down on a bench, but appellant refused and hit Chapman. Hillman and Officers R. Sepolio and David Watkins went to Chapman's aid. They were barely able to restrain appellant, who was a very large man; however, they managed to put him on the elevator and take him to the fifth floor. When the elevator door opened on the fifth floor, appellant lunged forward, breaking free of the officers' grip, and struck his head against a wall. Appellant was forcefully subdued with the additional aid of two fifth floor officers, G. S. Zetsch and D. R. DeVille. All of these officers testified at the *Jackson v. Denno* hearing, and it is clear from their accounts that appellant was the aggressor in the fight and that it took a great deal of force to subdue appellant. Officer Sepolio suffered a broken hand, and Chapman filed assault charges on appellant. The officers' testimony indicated that appellant received a cut on the right side of his face and suffered some sort of blow to his mouth that caused his lips to bleed and swell.

Appellant was placed, handcuffed, in an isolation cell. Zetsch and DeVille testified that no one bothered appellant during the remainder of their shift until 7:00 a. m.; a jail report reflects that appellant was quiet in the isolation cell at least until 11:00 a. m. that morning.

Dr. Mohammed Sarwar testified at trial that appellant was treated at Ben Taub Hospital at 5:30 in the afternoon on May 7, 1977. The treatment report indicated that appellant's lips were swollen and he had received a laceration near his right eye. His right eye was also bloodshot. Appellant received three stitches for the cut near the eye. Dr. Sarwar testified that the laceration could have been received in a fight. He further testified that he did not notice any bruises or abrasions on appellant's upper body, wrists, or neck.

Detective J. L. Bonds testified that he checked appellant out of jail at 10:00 a. m. on May 8 and took appellant to a magistrate who administered the *Miranda* warnings to appellant. Bonds then took appellant to the homicide division at the police station and questioned him concerning the death of David Samsel. Bonds testified that he knew appellant had been in a fight with some police officers and had been treated at Ben Taub Hospital. Bonds noticed that appellant's eyes were bloodshot, his right eye was swollen and bandaged, and he had red marks on his neck. Appellant looked to Bonds as though he had been in a fight.

Bonds questioned appellant for one and a half hours, read appellant his rights, and then typed up a confession that appellant signed. Detectives E. F. Uresti and J. M.

Donovan witnessed the signing of the confession. Bonds testified that no threats or coercive tactics were used to induce appellant to sign the confession. Bonds testified that he and appellant never discussed the alleged beatings, and he never promised to stop any such beatings in exchange for the confession. Appellant requested that no one in the jail "mess with him," but according to Bonds this did not seem important to appellant. Bonds testified that neither he nor anyone in his presence told appellant that appellant's sister or girlfriend would be released if he signed the statement.

Detective Uresti testified that he helped Bonds check appellant out of the jail. Appellant appeared as though he had been in a fight, but he did not complain to the magistrate about any ill treatment. Uresti testified that he did not witness any threats or coercion used against appellant, and the confession appeared to be a product of appellant's free will.

Detective Donovan testified that before appellant signed the statement, he (Donovan) asked appellant whether his injuries had anything to do with the confession. Appellant replied that he had some trouble in the jail and it had nothing to do with his signing the confession.

The trial court filed extensive findings of fact detailing much of what was testified to by the police officers. The court obviously disbelieved appellant's assertions of coercion. It concluded that appellant gave the confession of his own free will, without threats, physical abuse, promises, or other improper influences. The confession was admitted in evidence at trial.

■ The court is the sole judge of the weight of the testimony and the credibility of the witnesses at a *Jackson v. Denno* hearing, and may believe or disbelieve all or any part of any witness's testimony. *Alonzo v. State*, 591 S.W.2d 842; *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.1978). The evidence in this case sustains the court's findings. Appellant's testimony concerning the beating he received at the auto theft division was contradicted, as was his account of how the fight started at the

holding tank. The injuries appellant received in the fight were consistent with those for which appellant was treated on May 7, and which the detectives observed the next day when appellant signed the confession. The doctor who treated appellant did not notice any injuries to appellant's neck, and appellant did not complain of any such injury. Appellant testified that he was beaten in his isolation cell for two days prior to confessing, when he actually confessed the day after he was arrested and detained. All the officers who handled appellant testified that he was abusive and belligerent and was the aggressor. It appears that appellant became quiet once he was safely secured in the isolation cell.

■ Appellant told the detectives he had gotten in trouble at the jail and the injuries he received had nothing to do with his signing the confession. It is undisputed, even by appellant, that he was not threatened or abused during the questioning that led to the confession. Detective Bonds refuted appellant's claim that appellant's sister and girlfriend would not be released unless he confessed. Under the totality of the circumstances, we conclude that the State met its burden of proving the voluntariness of the confession, and the evidence sustains the court's findings. The confession was admissible; appellant's contention is overruled.

■ Appellant urges that the court in its charge authorized the jury to convict appellant of capital murder if they found that he committed the murder of David Samsel during the course of a conspiracy to commit robbery. Appellant correctly points out that a murder committed during the course of a conspiracy to commit robbery is not designated as a capital murder under V.T.C.A. Penal Code, Section 19.03(a)(2)—only intentional murders committed during the course of a robbery or an attempted robbery are so designated. Appellant filed no objection at trial to the court's charge, so the alleged error must be fundamental to merit reversal.

The indictment in this case alleged that appellant

. . . while in the course of committing and attempting to commit Robbery, intentionally cause[d] the death of David Harry Samsel, hereafter styled the Complainant, by shooting the Complainant with a gun. . . .

In applying the law to the facts in its charge to the jury, the court applied the theory of criminal responsibility set forth in V.T.C.A. Penal Code, Section 7.02(b). That subsection provides as follows:

(b) If, in the *attempt to carry out a conspiracy* to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of *the carrying out of the conspiracy.* [Emphasis added]

The court, in accordance with the evidence adduced at trial, charged the jury on the theory that appellant shot Samsel, and also on the theory that his companion Kyle McGill shot Samsel. The two paragraphs of the court's charge follow in their respective order:

4.

Now, if you find from the evidence beyond a reasonable doubt that Sammie Norman English, with either Kyle McGill and/or Aaron Earl Powell entered into a conspiracy to rob David Samsel and that pursuant thereto they did carry out or attempt to carry out such conspiracy to rob David Samsel and that on or about the 6th day of May, 1977 in Harris County, Texas, with the intent to deprive David Samsel, the owner, of personal property, to-wit, a motor vehicle and credit cards without his effective consent, Sammie Norman English, with either Kyle McGill and/or Aaron Earl Powell, did unlawfully appropriate from David Samsel, or attempt to unlawfully appropriate from David Samsel said property belonging to David Samsel and that Sammie Norman English while in the course of committing such theft of property from David Samsel and with intent to obtain or maintain control of said property intentionally caused bodily injury to David Samsel, to-wit, death by shooting David Samsel with a gun intending thereby to kill the said David Samsel and that the defendant, Sammie Norman English, pursuant to said conspiracy, if any, with the intent to promote, assist or aid the said Kyle McGill and/or Aaron Earl Powell in the commission of said robbery then and there at the time of the shooting, if any, was acting with and aiding the said Kyle McGill and/or Aaron Earl Powell in the execution or attempted execution of said robbery of David Samsel, if any, and that the shooting of David Samsel followed in the execution of the conspiracy, if any, and in furtherance of the unlawful purpose, if any, of Sammie Norman English with either Kyle McGill and/or Aaron Earl Powell to rob David Samsel of his property and that the shooting of David Samsel by Sammie Norman English, if there was such, was done in furtherance of the conspiracy to rob, if any, and the robbery or attempted robbery, if any, and was an offense that should have been anticipated as a result of the carrying out of the conspiracy, then you will find the defendant, Sammie Norman English, guilty of capital murder.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant, Sammie Norman English, of capital murder under the terms of the preceding paragraph and find him not guilty of capital murder, unless you find him guilty under the terms of the following paragraphs. [Emphasis added]

5.

Now, if you find from the evidence beyond a reasonable doubt that Sammie Norman English with either Kyle McGill and/or Aaron Earl Powell entered into a conspiracy to rob David Samsel and that pursuant thereto they did carry out or attempt to carry out such conspiracy to rob David Samsel and that on or about

the 6th day of May, 1977 in Harris County, Texas, with the intent to deprive David Samsel, the owner, of personal property, to-wit, a motor vehicle and credit cards without his effective consent, Sammie Norman English, with either Kyle McGill and/or Aaron Earl Powell did unlawfully appropriate from David Samsel, or attempt to unlawfully appropriate from David Samsel said property belonging to David Samsel and that Kyle McGill while in the course of committing such theft of property from David Samsel and with intent to obtain or maintain control of said property intentionally caused bodily injury to David Samsel, to-wit, death by shooting David Samsel with a gun intending thereby to kill the said David Samsel and that the defendant, Sammie Norman English, pursuant to said conspiracy, if any, with the intent to promote, assist or aid the said Kyle McGill and/or Aaron Earl Powell in the commission of said robbery then and there at the time of the shooting, if any, was acting with and aiding the said Kyle McGill and/or Aaron Earl Powell in the execution or attempted execution of said robbery of David Samsel, if any, and that the shooting of David Samsel followed in the execution of the conspiracy, if any, of Sammie Norman English with either Kyle McGill and/or Aaron Earl Powell to rob David Samsel of his property and that the shooting of David Samsel by Kyle McGill, if there was such, was done in furtherance of the conspiracy to rob, if any, and the robbery or attempted robbery, if any, and was an offense that should have been anticipated as a result of the carrying out of the conspiracy, then you will find the defendant, Sammie Norman English, guilty of capital murder. Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will acquit the defendant, Sammie Norman English, of capital murder.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder under the terms of the immediately preceding paragraph and find him not guilty, unless you have found him guilty· under the terms of Paragraph 4 above. [Emphasis added]

■ Section 7.02(b), supra, does not address itself to the offense of conspiracy, but to an *attempt to carry out a conspiracy*; it encompasses attempted or completed offenses that are the object of the conspiracy. The statute spells out how an actor can be held criminally responsible for an offense committed by another, when the actor does not have the specific intent to commit the offense committed by the other. In accordance with the language of Section 7.02(b), the court's charge required the jury to find that appellant, McGill, and Powell conspired to rob Samsel and then "did carry out or attempt to carry out" the conspiracy by robbing or attempting to rob Samsel, and that during the course of such robbery appellant or McGill intentionally killed Samsel. The court's charge did not authorize the jury to convict appellant if it found that the murder was committed during the course of a conspiracy to rob Samsel. See the underlined portions of the charge. The jury was required to find that appellant was a party to the offense of capital murder as designated by Section 19.03(a)(2), supra.

The court, in a commendable act of caution, also charged the jury as follows:

### 3.

Before you would be warranted in convicting the defendant, Sammie Norman English, of capital murder, you must find from the evidence beyond a reasonable doubt not only that Sammie Norman English with either Kyle McGill and/or Aaron Earl Powell on the occasion in question were engaged in the commission of the felony offense of robbery or attempted robbery of David Samsel as defined in this charge, but also that during the commission of the robbery, if any, Sammie Norman English shot David Samsel with the intention of killing him. Unless you find from the evidence beyond a reasonable doubt that Sammie Norman

English on the occasion in question specifically intended to kill the said David Samsel when he shot him, if he did, and unless you find from the evidence beyond a reasonable doubt that said act, if any, was committed in the course of committing or attempting to commit robbery, you cannot convict Sammie Norman English of the offense of capital murder. If you have such a reasonable doubt, you will acquit Sammie Norman English of capital murder.

This paragraph insured that the jury would not be confused by the conspiracy language the court used in applying the law to the facts.

▆▆▆ This Court has held that the law of parties announced in Sections 7.01 and 7.02 of the Penal Code is applicable to capital murder cases. *Wilder v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976). The theory of criminal responsibility set forth in Section 7.02(b) has been applied in capital cases. *Ruiz v. State*, 579 S.W.2d 206 (Tex.Cr.App.1979); *Wilder v. State*, supra. A trial court may charge the jury on the law of parties even though there is no such allegation in the indictment. *Pitts v. State*, 569 S.W.2d 898 (Tex.Cr.App.1978). This ground of error is overruled.

▆▆▆ Finally, appellant contends that the court assumed authority it did not have in setting aside an order granting appellant's motion for new trial. Appellant's trial concluded on November 11, 1977. Appellant filed a motion for new trial on November 21, 1977, and an amended motion for new trial on December 12, 1977. On December 12 Judge Tillman Smith, who did not preside at appellant's trial but was serving by assignment at the time of the motion for new trial as Presiding Judge of the 230th District Court of Harris County, inadvertently signed an order granting appellant's amended motion for new trial. On December 15 Judge Smith realized his error and attempted to set aside the order by writing at the bottom of the order form: "The above order was signed inadvertently and by mistake and the order was not intended to have any legal effect."

The next day, December 16, the Honorable Joe Wade held a hearing to establish the facts that underlay the signing of the mistaken order. Judge Smith testified that he signed the order by mistake when a group of papers were handed to him; at the time he was quite busy picking a jury and calling the docket. Judge Smith further testified that he did not intend to grant appellant a new trial, he knew nothing about appellant's case, no hearing had been held on the matter, and he had been under the impression that the form he signed was a motion for leave to file an amended motion for a new trial. At the conclusion of the hearing the court found that Judge Smith signed the order by inadvertence and mistake and Judge Smith had no intention of granting a new trial. The court found the order granting the new trial to be void.

This Court held in *Matthews v. State*, 40 Tex.Cr.R. 316, 50 S.W. 368 (1899), that after a trial court grants a motion for new trial it is without authority to subsequently set aside its order and overrule the motion for new trial. *Matthews* has been followed, although not recently, in *Jones v. State*, 51 Tex.Cr.R. 3, 100 S.W. 150 (1907), and *Ex parte Alexander*, 129 Tex.Cr.App. 500, 89 S.W.2d 411 (1936). The latter two opinions are terse and do not set out the facts that underlay the setting aside of the order granting a new trial. In *Matthews* it appears that the trial court granted the defendant's motion for new trial, then attempted to set aside its order because it had been under a "misapprehension of the evidence complained of by defendant in his motion for new trial." The instant case is distinguishable. The court in this case did not knowingly grant the motion for new trial and then decide to retract its decision. The court was not even aware that it was granting a motion for new trial when it signed the order. No hearing was held in this case; no evidence was adduced from which the court could have knowingly granted a new trial. The signing of an order form is not all there is to granting a new trial.

Further, the court's error in this case does not strike us as a judicial error, as certainly was the case in *Matthews*. The error here is more akin to clerical error, which can be corrected. Compare the trial court's authority to correct an improper entry of its judgment. *White v. State*, 543 S.W.2d 130 (Tex.Cr.App.1976); *Savant v. State*, 535 S.W.2d 190 (Tex.Cr.App.1976). This Court pointed out in *Moore v. State*, 446 S.W.2d 878 (Tex.Cr.App.1969), that a trial court may commit clerical error as well as judicial error.

We hold that this case is distinguishable from *Matthews*, supra, in that the court here never knowingly granted a new trial, but only signed the order form by mistake. To make our holding perfectly clear, however, to the extent *Matthews* can be construed to conflict with this holding, it is overruled. The court did not err in setting aside the order granting appellant's motion for new trial.

The judgment is affirmed.

CLINTON, Judge, dissenting.

Contrary to the notion of the majority that paragraphs 4 and 5 of the charge apply "the theory of criminal responsibility set forth in V.T.C.A. Penal Code, Section 7.02(b)"—the conspiracy theory—it is clear that the trial court also endeavored to intertwine the theory of criminal responsibility for the conduct of another prescribed in *id.*, Section 7.02(a)(2). Thus, midway in each paragraph there is posited:

"... and that the defendant, Sammie Norman English, pursuant to said conspiracy, if any, <u>with the intent to promote, assist or aid</u> the said Kyle McGill and/or [sic] Aaron Earl Powell <u>in the commission of said robbery</u> then and there at the time of the shooting, if any, <u>was acting with and aiding</u> the said Kyle McGill and/or [sic] Aaron Earl Powell <u>in the execution or attempted execution</u> of said robbery of David Samsel, if any, and that the shooting of David Samsel . . . was done in furtherance of . . . the robbery or attempted robbery."

The underscored language can be drawn only from Section 7.02(a)(2):

"(2) acting with intent to promote or assist the commission of the offense, he . . . aids, or attempts to aid the other person to commit the offense . . ."

The hybrid thus produced by that mix of two otherwise distinct legal theories of criminal responsibility lowers the level required by Section 7.02(a)(2)—that is, that for appellant to be responsible for the act of McGill in intentionally shooting to kill Samsel appellant, acting with intent to promote or assist commission of the offense of *murder*, must have aided or attempted to aid McGill to commit the offense of *murder*. Under the charge appellant could be held responsible for the act of McGill in intentionally shooting to kill Samsel if appellant, with intent to promote, assist or aid McGill or Powell in the commission of *robbery*, acted with and aided either in the execution or attempted execution of the *robbery*. Such a diminution of criminal responsibility is not authorized by law, and the trial court erred in permitting the jury to consider it.

Accordingly, I dissent.

ROBERTS, J., joins.