**Maurice ANDREWS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69078.

Court of Criminal Appeals of Texas, En Banc.

Sept. 23, 1987.

Walter M. Sekaly, Harold J. Laine, Jr., Beaumont, for appellant.

James S. McGrath, Dist. Atty., and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

Maurice Andrews, hereinafter appellant, appeals to this Court his conviction by the jury of the capital murder of Joe Angel Granado, the then owner of Granado's Jewelry Store in Beaumont, which murder occurred during the course of a robbery of Granado. Another person, Arturo Melindez, an employee of the store, was also murdered. The trial judge, after the jury answered in the affirmative the special issues submitted to it pursuant to Article 37.071, V.A.C.C.P., assessed appellant's punishment at death.[1] We affirm.

Appellant presents to us what we will refer to as eight points of error for review. Three of his points directly or indirectly challenge the sufficiency of the evidence as to guilt; two points of error concern the applicability of the Supreme Court of the United States' decision of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), to this cause; two points of error challenge the constitutionality of V.T.C.A., Penal Code, § 19.03, when used in conjunction with V.T.C.A., Penal Code, § 7.02; and one point of error challenges the trial judge's decision to sustain the State's challenge for cause as to prospective venireman Frank James Landry.

■ Before addressing appellant's claim that the evidence is insufficient to support the jury's verdict finding him guilty of the capital murder of Granado, and that the trial judge did not require the jury, as a predicate to the jury returning a verdict of guilty, that it had to first believe beyond a reasonable doubt that appellant killed Granado or that appellant intended that Granado be killed, we find that we must first dispel the notion that appellant has about *Enmund v. Florida*, supra, namely, that its holding applies to the guilt stage as well as the punishment stage of the trial. It does not. It only applies to the punishment stage of the trial. Therefore, we will first discuss *Enmund*, supra, as well as the subsequent Supreme Court decision of *Tison and Tison v. Arizona*, —— U.S. ——, 107 S.Ct. 1676, 95 L.Ed.2d 127 (April 21, 1987).

In *Enmund v. Florida*, supra, the Supreme Court addressed the question whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life, and answered the question in the negative as to that case. It expressly held that the death penalty may not be imposed on one who merely aids and abets a felony in the course of which a murder is committed by another and who does not himself kill, attempt to kill, or intend that a killing take place or that

---

1. This is a companion case to *Johnson v. State,* 691 S.W.2d 619 (Tex.Cr.App.1985). We are informed that the defendant Johnson was executed by the State of Texas on June 24, 1987; that a third co-defendant, Malcolm Davis, who did not testify for or against appellant in this cause, pled guilty to a charge of aggravated robbery and his punishment was assessed by the trial judge at life imprisonment in the Department of Corrections. Davis did not appeal his conviction.

lethal force will be employed. Also see *Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986). However, in *Tison and Tison*, supra, the Supreme Court retreated from its judicially created *Enmund v. Florida*, supra, standard for capital liability and announced a new culpable capital liability standard for one who does not actually commit the killing, but who aids and abets others in the commission of a felony in the course of which a person is killed. It expressly held in *Tison and Tison*, supra, that the validity of the death penalty that is assessed a "non-trigger person" will depend upon a defendant's "major participation in the felony committed, combined with reckless indifference to human life." If such is found to be true, then this is sufficient to satisfy the *Enmund* culpability capital liability requirement.

Thus, a clear reading of the above decisions of the Supreme Court should make it obvious to anyone that they only concern imposing the death penalty on one who, though not the actual killer, was a major participant in the felony committed. They do not concern whether one, acting as a party to the commission of the felony offense of capital murder, may be found guilty of committing that offense.

In *Green v. State*, 682 S.W.2d 271, 287 (Tex.Cr.App.1984), this Court expressly held: "While the law of parties can apply to *convict* an accused of capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the individual defendant ... [I]t is error to apply directly the law of parties to any of the punishment issues in a capital murder case—that is, so a capital defendant may be punished for the deliberate conduct of another, the future dangerousness of another or the unreasonable response to provocation by another—without regard to the individual conduct of the defendant whose fate is in question ... We hold that the law of parties may not be applied to the three special issues under Art. 37.071(b). *Wilder and Armour v. State*, 583 S.W.2d 349 (Tex.Cr.App.1979), is overruled as far as it is inconsistent with this opinion."

Also see *Selvage v. State*, 680 S.W.2d 17 (Tex.Cr.App.1984), which also involved a robbery-murder that occurred inside of a jewelry store; *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr.App.1983).

■ Having overruled appellant's erroneous belief that *Enmund*, supra, is applicable to the guilt stage of the trial, we will next discuss his claim that the circumstantial evidence as to his guilt is insufficient. The learned trial judge in this cause expressly instructed the jury on the law of circumstantial evidence. Cf. *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr.App.1981), in which a majority of this Court held that an instruction on the law of circumstantial evidence need no longer be given, although it is not error for the trial judge to give such an instruction. The decision of *Hankins v. State*, supra, was not handed down until long after appellant's trial had occurred. Thus, we cannot unequivocally state that had *Hankins*, supra, been the law at the time of appellant's trial the trial judge would have still given an instruction on the law of circumstantial evidence.

It is now axiomatic in this State that the standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases. The evidence must be viewed in the light most favorable to the verdict, and the standard is whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. If the State's evidence supports an inference other than a finding of the essential elements of the crime, then we are compelled to hold that no trier of fact could rationally find the accused guilty beyond a reasonable doubt, and this is true irrespective of the character of the evidence. See the many, many cases collated under *West Criminal Digest* Criminal Law Keys 552(3) and 1144.-13(2).

The State presented the following evidence. Appellant neither testified nor presented any evidence at the guilt stage of the trial.

1. Luisa Morales, an employee of the Belle and Beau Tailor Shop, which was located

next door to Granado's Jewelry Shop, testified that on the day in question, April 8, 1982, between approximately 12:15 and 12:20 p.m., while reading the newspaper, with her husband nearby, she heard two loud noises, "Bang, Bang". She then went to the front door of the business where she observed two black men leaving Granado's Jewelry Store. She described one of the men as being medium in height, "Six foot two inches, six foot one inch", and wearing a dark brown, "chocolate brown jacket," "like a type of shirt". She described the other man as being shorter, "Five—about five-seven" in height, and wearing a red, "cardinal colored", cap. Morales testified that the men left the jewelry store "real fast." Morales then summoned her husband, who went inside of the jewelry store, came out, told her what he had seen, and told her to go and notify the police. Morales told someone else to notify the police. Soon thereafter, the police arrived.

2. Sergeant Harrell Fowler of the Beaumont Police Department testified that while on duty at the police station, which was just down the street from where Granado's Jewelry Store was located, he heard a police radio broadcast that there was "A possible robbery-shooting at 280 Bowie here in Beaumont, Granado's Jewelry Store." Fowler immediately went to that location. After Fowler arrived, he observed the bodies of Granado and Melindez, with gunshot wounds to their heads. Fowler concluded that Melindez was dead but that Granado was still alive. Ambulance attendants were then attempting to save Granado's life. Although Fowler seized certain items at the scene, the only thing of significance to us that he seized is a "black Playboy with a white bunny cap."

3. Dr. Howard Wilcox performed the autopsy on Melindez. In Wilcox's opinion, Melindez died as a result of a gun shot wound to the head. Wilcox recovered from Melindez' head two fragments of a bullet, which were either "a .32 or .38 caliber bullet", which he turned over to a police officer by the name of Pierce.

4. Dr. Stanley M. Le Ber performed the autopsy on Granado. In Le Ber's opinion,

Granado died as a result of two gun shot wounds to the head, one to the left side of the forehead and the other to the left side of the back of the head, which wounds were caused by either "a small caliber, .22, the other was a .38 caliber." The recovered bullets were turned over to a Detective Hecht. Le Ber also observed on the bridge of Granado's nose "slight bruising"; a superficial laceration over his forehead; and a bruise over the right ear.

5. Daisy May White, who lived with co-defendant Malcolm Davis and his wife, Brenda, in Port Arthur, testified that sometime around 10:00 a.m., "maybe earlier", which would have been a little over 2 hours before the killings took place, appellant came to her residence. At that time, appellant was wearing a "dark brown buttondown shirt" and a "black with a white Playboy bunny in the front" cap. White testified that Davis was wearing "a dark red baseball cap." Around 10:30 a.m., appellant and Davis left the residence in Davis' vehicle. Between 1:00 and 1:30 p.m. they returned to the residence with a "little short guy", who she identified as Elliott Johnson, appellant's co-defendant. Davis told White to move her car, which was parked near the garage, so that he could park his car in the garage, which she did. After driving his car inside of the garage, he closed the garage door. White testified that it was unusual for Davis to park his car in the garage. Appellant, Davis, and Johnson then went inside of the house to "the kids' bedroom." Davis' wife was also inside of that room of the house. Later, appellant, Davis, and Johnson went inside of the bathroom, after which appellant returned to Davis' car, where he took out a bag and an orange colored towel from the trunk and some clothes from the back seat. After appellant returned to the inside of the residence, White observed that he had a pistol, "a medium size pistol," which she had seen him carry before. It was "stuck down in his side, in the front of his pants." White testified that Davis had "a small pistol", which was smaller than appellant's. During this time, a male driving a pickup truck arrived at the residence, after which he, appellant, Davis, and Johnson went in-

side one of the bedrooms of the residence. Soon thereafter, Davis came outside and asked his wife, "Where is that?" Brenda then got him the towel that had been removed from Davis' car. White testified that inside of the towel were "Lots of jewelry"; "necklaces and rings and watches, bracelets, and gold state pendants that go around your neck." The above individual who had arrived in the pick up truck, who was identified as Oneal McCarthy, left soon thereafter. Later, Davis gave his pistol to his wife "and told her to clean it" and take it to "Greeka", who was appellant's wife, which she did. Davis also told Brenda: "Oh, by the way, we had to shoot those guys or they would have killed us." Davis left after he told Brenda that he "was going to Houston and pick up Laura May (phonetic) and her husband." Thereafter, Brenda took the pistol that appellant had been carrying, some envelopes, and "a red baseball cap" to a storehouse in the backyard of the residence. Brenda and White then drove to Greeka's residence where Brenda gave Davis' gun to Greeka. White testified that the next morning Davis asked Brenda "to put a [gold necklace with a Playboy bunny on it, a little turtle-like on it] on him, [and said] that he was going to get something out of the deal if it wasn't no more than that." This was the same type Playboy bunny that was on the cap that appellant was wearing. Davis thereafter left in White's car to go to Houston. Davis was arrested while driving White's car, for not having liability insurance. Later that day, White and Brenda were arrested while driving Davis' car. At first, White declined to cooperate with the police about what she knew about the robbery-murders, but later she did.

6. Eddie Collins, police officer with the Port Arthur Police Department, testified that a couple of days before the robbery-murders he had seen appellant wearing a black and white Playboy bunny cap. Collins caused appellant and Davis to be arrested, when Davis was driving a vehicle. At that time, appellant was wearing "a Black cap with a white Playboy emblem on it." Davis was wearing a white cap, and wearing "a gold chain with a Playboy em-

blem around his neck, with a little bunny on the end." Later, Davis consented to a search of his residence, during which two caps, "One was a pink Playboy cap and the other a red maroonish-color cap," were seized. Collins also testified that he arrested Brenda and White. After obtaining a statement from White, a search warrant to search the Davis residence was obtained. During that search, the police found a .38 caliber pistol, a burned envelope, "with Granado Jewelry on it", a bill of a baseball cap, "red in color", that had been burned, and one ring. Pursuant to another search warrant, for Andrews residence, a large amount of jewelry was found inside of a tray located in the refrigerator of that residence; another ring and Letters addressed to Davis and Greeka were also seized from appellant's residence, as well as three empty coin wrappers. Collins also testified that Davis is taller and huskier than appellant or Johnson, and that Johnson is shorter than appellant and has "a smaller build than appellant."

7. Mildred Mayon, an employee of the Super Bad Shop, located in Port Arthur, testified that on the afternoon after the murders at Granado's Jewelry Store she sold appellant a black Playboy cap with a white bunny on it. Mayon also testified that Davis had previously purchased a pink or peach colored Playboy cap.

8. Lynn Baldwin, Granado's stepson, testified that because he was on strike he spent a lot of time at the jewelry store. Baldwin testified that Granado kept a lot of diamonds in a briefcase, but when he looked inside of it after the murder he did not see anything except some papers. As to the Playboy cap that was found inside the store, Baldwin testified that neither Granado nor Melindez ever wore such a cap. Baldwin identified envelopes that had been seized during the above searches as being the same kind that Granado used to put customers' possessions in that had been brought to the store. Baldwin identified one of the rings that was found in the search of appellant's residence as being Granado's personal ring. Baldwin further

testified that he found a bullet in the store after the murders were committed.

9. Blain Coleman, owner of the Executive Club, testified that he had taken a ring, a "rabbit, bunny" pendant, and a stickpin to the jewelry store. Coleman identified the ring that was seized from the refrigerator located in appellant's residence as being his and also identified the pendant taken off the neck of appellant as being his. His diamond stickpin that had nine diamonds in it was never recovered.

10. Patricia Stine, manager of Gemco Jewelers, testified that her company had delivered to Granado's Jewelry Store before the robbery-murders two plain gold wedding bands, one 14 karat chain, a ruby cluster, one emerald, one ruby and one diamond ring, one opal and diamond ring to be repaired. She matched up several of these items with items taken from appellant's residence. The other items were never recovered.

11. Rolanda Russell, an employee of Frank's Jewelry in Silsbee, testified similarly to what Stine had testified to.

12. Charles Little, a police officer with the Beaumont Police Department, testified that when he arrived at the jewelry store he found Melindez lying face down and Granado in a fetal position over Melindez. Little also testified to the chain of custody as to some of the items recovered in appellant's residence. Over objection, Little testified that "one-third [of the items taken from the jewelry store] had been recovered and two-thirds of the items have not been recovered."

13. Mark Pierce, another Beaumont Police Officer, also testified to chain of custody concerning the bullet fragments taken from the bodies of Melindez and Granado.

14. Jerry Hecht, another Beaumont Police Officer, testified to the chain of custody of the bullet that Baldwin had found and the bullet fragments that Pierce had obtained.

15. Gloria Mae Thomas testified that two days before the murders at the jewelry store occurred Davis owed her $500. Davis and appellant went to her residence at that time. Appellant was then armed with two pistols. Thomas, appellant, Davis, and a Joseph Guillory went to Houston that day. Davis at that time had a .22 pistol. Appellant was then wearing a black Playboy bunny cap. Davis was wearing a light pink Playboy bunny cap. The parties went to the residence of Charles "Big Head" Chapman. Davis asked "Big Head" if he wanted to purchase or knew where he could fence "about $20,000 worth of jewelry." "Head" told Davis to let him see the jewelry but Davis told him that "he was going to let him see it later on." During the late afternoon after the murders had occurred, with appellant remaining in a car, Davis and Johnson went inside of Thomas' residence and asked to speak with "Big Head", but he was not there at that time. The three then left. Thomas also testified that appellant often talked about committing robberies and told her that if he ever "pulled a big robbery" that "he wouldn't leave nobody around to talk about it."

16. The testimony of Charles "Big Head" Chapman, who testified that he was "a little fence but not a big fence" and "locater of narcotics for people", was pretty much cumulative to Thomas', except that "Big Head" testified that when he came into contact with appellant, see Thomas' *ante*, appellant had what "Big Head" believed to be a .38 caliber pistol. Appellant then stated that nobody would ever give him any trouble because "this here [referring to his pistol] will take care of that." Appellant also stated that "he is the best in the business when it comes to jack, said he could jack himself, he could protect himself from the jack. I do mine the old way, there won't be any witnesses."

17. Ronald D. Richardson, a Department of Public Safety employee, testified that in his capacity as a firearms examiner he had occasion to receive from Officer Hecht bullets, bullet fragments, and a .38 caliber pistol, and in his opinion a bullet taken from Granado's head was fired from a pistol identified as being the one that appellant was known to carry. Richardson also identified a bullet fragment taken from Melindez' head as having been fired from appellant's pistol. Richardson further testified that in his opinion the other bullet

fragment taken from Melindez' head came from a .22 caliber pistol. The bullet that Baldwin recovered was identified as having been fired from a .38 caliber pistol. Richardson also testified that the bullets had been altered in order to obtain "more devastation" upon impact.

18. Through several witnesses, a letter that was found in a supermarket in Port Arthur was shown to be written by appellant. In the letter, the following of importance was written to purportedly appellant's wife: "When I get out we are going to be worth 50,000 grands. Smile. You got 50,000 grands on your property right now. That's all. I am saying smile, and that's on the ups. And don't say nothing, and I mean nothing ... I know what I was doing ... Now you know what's in your yard. You got 50,000 grands worth of D in your yard. And if you don't know what I am talking about, what glow at night. Smile ... P.S. I never been to Las Vegas. Smile ..."

19. Lena Granado, the widow of Granado, testified that her husband died at the hospital where he was taken after being shot. She also identified a photograph of her late husband.

At this time, both the State and the defense rested. After arguments, the jury returned a verdict finding appellant "guilty of the offense of capital murder as alleged in the indictment."

The jury was instructed that before it could find appellant guilty of the offense of capital murder, it first had to find from the evidence beyond a reasonable doubt that appellant, "either acting alone or as a party with Malcolm Davis and/or Elliott Rod Johnson, and/or O'Neal McCarthy,[2] did then and there, while in the course of committing or attempting to commit Robbery upon and of Joe Angel Granado, intentionally cause the death of Joe Angel Granado by shooting him with a gun."

Viewing the above evidence in the light most favorable to the verdict of the jury, in conjunction with the above instruction, we conclude that any rational trier of fact could find the evidence sufficient to establish beyond a reasonable doubt that appellant, acting either alone or as a party, committed the capital murder of Granado, as alleged in the indictment.

Appellant's points of error numbered two, three, and four, wherein he asserts that the evidence is insufficient to sustain the jury's verdict finding him guilty of the capital murder of Granado, are overruled.

■ Appellant asserts in his eighth point of error that "The Trial Court erred in granting the State's challenge for cause under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), of Frank James Landry, venireman number 19, for the reason that said venireman was not disqualified under Witherspoon and Appellant was denied a desirable juror." We disagree.

The record reflects that initially the trial judge told Landry that if he did not understand any question that he was asked by the attorneys, he should "Ask them five or six times if you have to. It is their job to ask it where you can understand it."

Landry initially told one of the prosecutors that he did not believe in the death penalty, that he had this belief all his life, and that his belief was so strong that *he* could not give *it* under any circumstances. In response to the prosecutor's question, whether he would "always answer at least one [of the special issues] no to ensure that the death penalty was not assessed", Landry stated: "A: Yeah, I would answer one of them no, maybe two of them." However, almost immediately, Landry told the prosecutor that he would not answer one or more of the questions in the negative "Just to ensure that the death penalty was not assessed." Soon thereafter, after Landry stated that he "would not take the oath because he could not follow the law of the State of Texas that provides for the death penalty," the prosecutor challenged him for cause.

2. See White's testimony, *ante,* and footnote 1, *ante.* We have been informed that McCarthy pled guilty to a murder charge and his punishment was assessed at 30 years' confinement in the Department of Corrections.

One of appellant's attorneys then questioned Landry. Landry told defense counsel that if it were proved beyond a reasonable doubt that the answer to the first special issue should be answered in the affirmative, he would answer it in the affirmative. However, Landry also stated that he could not answer the second special issue under the same circumstances because he could not "predict the future." Landry nevertheless testified that if he "believed it" should be answered in the affirmative, he would answer the question in the affirmative. At this time, the trial judge denied the State's challenge for cause.

The prosecutor then asked Landry whether he could answer the questions in the affirmative, knowing that if he did "the defendant was going to die?" Landry replied: "I wouldn't answer one of them no for that—just to keep him from getting the death sentence. Like I told you, I wouldn't even take the oath." However, Landry also stated that he would vote "yes to all three of them", but, knowing that if the questions were all answered in the affirmative would result in the death penalty being assessed, he stated that it would be "hard to say" whether he would answer the questions in the affirmative. The prosecutor soon thereafter asked Landry, "Q: The question to you now, Mr. Landry, is this: we want to know, can you do it or can't you do it?" Landry responded: "I can't ..." Landry answered the prosecutor's last two questions as follows: "Qs: Do you believe in the death penalty? and Can you take part in the process in which the death penalty is assessed? As: No. No." The State then again challenged Landry for cause.

Defense counsel then asked Landry: "Q: [W]ould you do your very best to answer these three questions honestly, that is, if the evidence showed that they should be answered yes, answer them yes, and if the evidence showed they should be answered no, answer them no?", with Landry responding: "Yes, sir." When asked by the prosecutor, "Q: Are there any circumstances under which you could participate in a process and do those things that would result in the death penalty being assessed, no matter what, any circumstances under which you could do those things which would result in the death penalty being assessed?", Landry replied: "You lost me again." At this time, over objection, the trial judge sustained the prosecutor's challenge for cause.

The Supreme Court of the United States has decreed that the improper exclusion of even one potential juror in a capital murder case on the basis of his general opposition to the death penalty precludes the execution of the death penalty. See *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). This decision was just recently reaffirmed in *Gray v. Mississippi*, — U.S. ——, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).

A juror may not be excluded for cause simply because the mandatory penalty of death or imprisonment for life might affect him. See *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). "[T]he question is not 'if' but 'how much.' Or, in other words, it is a matter of degree—to what extent would the juror be affected." *Ex parte Hughes*, 728 S.W.2d 372, 374 (Tex.Cr.App.1987).

The Supreme Court also has decreed that a juror's views regarding the death penalty, that are of such a nature that they would prevent or substantially impair the performance of his duties in accordance with his instructions and his oath, subjects him to a State's challenge for cause. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Also see *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986).

We find that given the totality of his voir dire, the trial judge did not err in sustaining the State's challenge for cause because we find Landry's views on the death penalty would have prevented or substantially impaired his performance as a juror in accordance with his instructions and oath. E.g., *Mays v. State*, 726 S.W.2d 937, 948 (Tex.Cr.App.1986); *Sawyers v. State*, 724 S.W.2d 24, 27 (Tex.Cr.App.1986); *Vanderbilt v. State*, 629 S.W.2d 709 (Tex.Cr.App.

1981). Cf. *Turner v. State*, 635 S.W.2d 734 (Tex.Cr.App.1982).

Notwithstanding that Landry stated that he would answer the special issues in the affirmative, even though he realized that it would result in the assessment of the death penalty, a clear reading of his total voir dire examination makes it clear to us that his views on the death penalty would have prevented or substantially impaired his performance as a juror in accordance with his instructions and his oath as a juror. The trial judge did not err in sustaining the State's challenge for cause. Also see *Ex parte Russell*, 720 S.W.2d 477 (Tex.Cr.App. 1986), and the many cases cited on page 484.

Appellant's eighth point of error is overruled.

■ Appellant asserts in his first point of error that "The trial court abused its discretion at the voir dire phase of the trial in refusing to allow the defense to qualify prospective jurors within the restrictions of the Eighth Amendment as announced in *Enmund v. Florida*." In his seventh point of error, appellant contends that "The Trial Court erred in denying his challenge for cause of David Malcolm Simon, venireman number two, based upon the holding in *Enmund v. Florida*, and thereby requiring Appellant to use one of his peremptory challenges on said venireman, resulting in Appellant being required to accept Curtis Joseph Tomplait, venireman number 57, who was to the Appellant an undesirable juror." Because we find that these points of error are related, we will consider them together.

We first point out that *Enmund*, supra, was handed down on July 2, 1982 and the voir dire examination in this cause commenced on September 22, 1982, not quite three months later. Because this Court had not then had the opportunity to construe or interpret *Enmund*, supra, the trial judge and the attorneys were at a disadvantage in deciding just how *Enmund*, supra, might be applicable to our procedure governing the assessment of the death penalty.

However, this Court had long held that the law of parties announced in Sections 7.01 and 7.02 of the Penal Code is applicable to capital murder cases, and the theory of criminal responsibility set forth in Section 7.02(b) had been applied in capital cases. See, for example, *English v. State*, 592 S.W.2d 949, 955 (Tex.Cr.App.1980). And *Enmund*, supra, did not in any way, form, or fashion change this law. *Enmund*, supra, clearly does not concern whether one, acting as a party to the commission of the felony offense of capital murder, may be found guilty of capital murder. Thus, appellant was clearly on notice of the fact that the law of parties could be applied to the offense of capital murder, and that the sole responsibility of a jury where the defendant has been found guilty of capital murder is to decide whether the special issues should be answered either in the affirmative or the negative. However, he was not on notice as to just how the voir dire examination of the jury should be conducted where the law of parties might be implicated in a capital murder case—as to answering the special issues.

In *Green v. State*, supra, this Court expressly held that the trial judge should not, where the defendant has been found guilty of capital murder, instruct the jury at the punishment stage of the trial on the law of parties as to any of the special issues, see Art. 37.071, supra, thus overruling *Wilder and Armour v. State*, 583 S.W.2d 349, 356 (Tex.Cr.App.1979), which held that the law of parties could be applied not only to the guilt stage of the trial but also in answering the special issues under Art. 37.071, supra. Also see *Meanes v. State*, supra. *Green*, supra, was not extant when the voir dire examination in appellant's cause took place.

Just recently, this Court in *Cuevas v. State*, 742 S.W.2d 331 (Tex.Cr.App.1987), attempted to explain why, given the way that Art. 37.071, supra, is written, there is no necessity for the jury to make an *Enmund*, supra, finding.

In this instance, the indictment did not allege that appellant committed the offense of capital murder while acting as a party,

and the general verdict of the jury finding appellant guilty of capital murder does not inform us whether that finding was based solely on appellant's own individual conduct versus his conduct as a party. The jury, however, was instructed that it could find appellant guilty if it found that he was acting as a party with Davis, Johnson, or McCarthy in the murder of Granado.

The issue as we see it in this cause is not whether under *Enmund*, supra, or *Tison and Tison*, supra, the death penalty is an appropriate penalty for appellant, but, instead, is whether any venireperson, including Simon, clearly demonstrated or exhibited such a bias or prejudice against the law that would cause him to be subjected to a challenge for cause. See *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr.App.1982), where the issue of bias was discussed.

The record reflects that during Simon's voir dire examination the prosecutor correctly explained to Simon the application of the law of parties to a criminal case. See V.T.C.A., Penal Code, § 7.02(a)(2), which states that a defendant is criminally responsible for the conduct of another person when "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." The voir dire examination by defense counsel of Simon makes it clear to us that Simon became confused over the distinction between finding a defendant guilty as a party to the offense of capital murder and the jury answering the special issues. We do not find where this confusion was ever cleared up by either defense counsel, the prosecutor, or the trial judge. The defense challenged Simon for cause after Simon made it clear that in answering the special issues he could not make a distinction between a defendant who was the "non-shooter" and where he was the actual "shooter". The trial judge did not then rule on appellant's challenge for cause. Simon later stated: "I believe I could still follow the law and put my personal feelings out of the picture." After the prosecutor announced that "the State would be happy to accept Mr. Simon as a juror," defense counsel stated: "We will excuse Mr. Simon." Appellant used his first peremptory strike on Simon. The record does not reflect that defense counsel reurged his challenge for cause as to Simon. The trial judge, however, stated for the record that appellant's earlier challenge for cause was then being denied.

The record is clear that at no time did the trial judge place any constraints on appellant's examination of Simon. Appellant was clearly given sufficient leeway to ascertain whether Simon's views on the law of parties, as applicable to either guilt or punishment, would have affected him to such an extent that he was subject to a challenge for cause by appellant.

Simon stated that notwithstanding his views that if the defendant, a party to the offense of murder, did not intend that the victim be killed or did not anticipate the killing he would vote to answer the special issues in the affirmative, he could "follow the law."

However, Simon's confusion regarding the applicability of the law of parties to the special issues was clearly demonstrated when he stated during defense counsel's questioning of him *regarding the special issues*, "I thought that the law was that if he was with the other members he was still guilty. Is that right?" Defense counsel then attempted to explain what he was having difficulty articulating, but in doing so may have further confused Simon because the two hypotheticals he then gave Simon would be applicable only to *guilt:* "Let me give you an example. You and I—well, not you and I but John and Harry decide that they are going to go down and rob the American National Bank. John and Harry decide they better take a pistol with them to try to scare the people so that they can get their money. And John and Harry have a discussion before they go down to the bank. And they say, now look, let's don't hurt anybody here, let's just try to get their money and get out of there. So they go on down there and somebody, one of the tellers, suddenly grabs for a pistol and Harry gets scared immediately and fires and kills the teller. That is one situation. Situation No. 2, assume every-

thing except the conversation between Harry and John. Now Harry and John have the conversation, let's get the money and take the pistol and if anybody gives us trouble let's blow them away. That is Situation No. 2." When asked, "Do you see any difference in those two situations, as far as criminal responsibility is concerned, for the non-shooter, as opposed to the shooter?", Simon responded: "No, sir. Q: You feel both were equally guilty? A: yes, sir." At this time, defense counsel challenged Simon for cause. The trial judge correctly pointed out to defense counsel that he had not gone far enough: "Now the punishment phase, you need to ask him about that." Counsel then asked Simon, "Do you feel that under both of those situations you would be compelled to answer the three questions submitted to you yes?" Simon replied: "Yes, sir." Defense counsel then reurged his challenge. The trial judge did not then rule on the challenge. Defense counsel then made the following statements to Simon, "What I am asking you—and only you can really tell us—since you feel the way you do—and I do not fault you and no one has a right to fault you for it— ...", and finally asked, "are you telling us that if you were selected on the jury you would just put your personal feelings completely aside and follow the Court's charge on this or do you feel that it would be, it would not be possible for you to violate your own feelings about this, which you have just as much right to as anybody else. Only you can tell us. It is a tough question I know." Simon replied: "I believe I could still follow the law and put my personal feelings out of the picture." After this, the State announced that it "would be happy to accept Mr. Simon as a juror". Defense counsel then announced: "We will excuse Mr. Simon." Notwithstanding this statement, the trial judge made it clear for the record that he was then overruling or denying appellant's earlier made challenge for cause.

Had appellant more clearly articulated to Simon the law of parties as to how it might apply to the issue of guilt in a capital murder case and answering the punishment special issues, and it was clearly demonstrated that Simon had such a bias or prejudice against the law of parties in resolving the question of appellant's guilt or the special issues, we might be compelled to agree with appellant that the trial judge erred in not sustaining his challenge for cause as to Simon. However, given the totality of Simon's voir dire examination, we cannot hold as a matter of law that it was unequivocally demonstrated by defense counsel that Simon was biased or prejudiced against the principles of law that proscribes application of the law of parties to the special issues.

Appellant's contention that the trial judge erred in overruling his challenge for cause as to venireman Simon is overruled.

We also overrule appellant's first point of error that "The Trial Court abused its discretion at the voir dire phase of the trial in refusing to allow the defense to qualify prospective jurors within the restrictions of the Eighth Amendment as announced in *Enmund v. Florida*."

Our reading of the record causes us to agree with the following statement that the State makes in its brief at page 11: "The State has undertaken a complete examination of the record of the voir dire of every venireman (a task which appellant apparently did not undertake) and has ascertained that the record shows that the trial court *did* allow him to do so; and that, as a matter of fact, no question (whether related to Enmund or otherwise) sought to be posed by appellant to any venireman, from the first to the last, was ever barred or refused by the trial court." Our records do not reflect or indicate where appellant to this day has ever challenged the statement of the assistant district attorney who represents the State in this appeal. We also find that, with the exception of venireman Simon, appellant does not under his first point of error ever specifically point us to the record where we might find that the trial judge restricted his voir dire examination of a single venireperson, and our reading of the record does not reflect any such restriction.

Appellant contends in his fifth point of error that "Section 19.03, Texas Penal Code, when used in conjunction with Section 7.02, Texas Penal Code, is unconstitutional for the reason that it authorizes a guilty verdict based on facts and/or circumstances not constitutionally sufficient under the Eighth and Fourteenth Amendments to the United States Constitution." In his sixth point of error, appellant asserts that "Section 19.03, Texas Penal Code, when used in conjunction with Section 7.02, Texas Penal Code, is unconstitutional for the reason that the aggregate effect constitutes an impermissible extension of the concept of complicity responsibility in violation of the Eighth and Fourteenth Amendments to the United States Constitution."

We find that much of what we have previously stated regarding *Enmund v. Florida,* supra, applicable to these two points of error, and is more than sufficient to warrant us overruling these points of error without further addressing them.

Nevertheless, we will discuss these two points in order to emphasize that we strongly disagree with appellant's claim that "in light of the *Enmund* case, supra, that when the State is relying upon the provisions of Section 7.02(a)(2) and (b) for a conviction for Capital Murder by complicity responsibility, one or more of the above culpable mental states [appellant does not expressly state to what culpable mental states he is referring; we therefore assume he is referring to the culpable mental state of intentionally] must be proved by the evidence, beyond a reasonable doubt. As it now stands, our statutes do not require any of these culpable mental states to be proved, and it is for this reason that Appellant claims that Section 19.03(a)(2) used in conjunction with Section 7.02(a)(2) and/or (b) is unconstitutional." (Pages 16–17, appellant's brief.)

The offense of capital murder, as applied to this cause, is committed when the defendant intentionally commits the offense of murder in the course of committing or attempting to commit robbery. See V.T.C.A., Penal Code § 19.03(a)(2) and § 19.02(a)(1). One of the ways that a person may be guilty as a party to the commission of the offense of capital murder is if the murder is committed by another individual and the defendant, acting with intent to promote or assist the commission of the murder, solicits, encourages, directs, aids, or attempts to aid the other person in committing the offense of murder. The record reflects that the trial judge instructed the jury on all of these elements.

None of the provisions of §§ 19.02, 19.03, or 7.02 concern themselves with *punishment* where the defendant is on trial for capital murder, either individually or as a party. In the event of conviction for capital murder, only the provisions of Art. 37.-071, supra, are then applicable. As this Court pointed out in *Green v. State,* supra, "The [special issues in Art. 37.071, supra] do not define 'offenses': they are tailored to guide a jury in examining the culpability and conduct of the individual defendant, and indeed must do so in order to comply with the guidelines set forth by the United States Supreme Court. (Citations omitted.) ... [T]he special issues themselves clearly focus the jury's attention on the individual defendant, and indeed must do so in order to give the individualized examination under *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). While the law of parties can apply to convict an accused of capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the individual defendant ... This examination is performed in Texas through the special issues. *Enmund* clearly requires that the individual defendant be shown to be culpable due to his own actions, intentions, and expectations and not those of his cohorts. *Id.* at 102 S.Ct. 3378." (286–287). Therefore, "It is unambiguous that the law of parties provided by the penal code applies only to the jury's consideration of an accused's guilt for the commission of an offense in the first stage of our bifurcated felony trial procedure. (Footnote omitted.) ... It is [thus] apparent then that while a capital murder defendant may be held 'criminally responsible'—and therefore found guilty—

through application of our law of parties, the determinations made by the jury in answering the special issues dictated by Article 37.071(b), supra, must be made solely upon consideration of the particularized conduct of the individual defendant which, by virtue of §§ 7.01 and 7.02, supra, contributed to another's causing the death of the victim." (377–378). (Clinton, J. concurring opinion in *Meanes v. State*, supra.).

Therefore, contrary to appellant, we find that although a jury might find a "nonshooter" guilty of capital murder, before it can answer special issue number one, the "deliberateness" issue, in the affirmative, it must find beyond a reasonable doubt that "the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Although we agree with appellant that "deliberately" is neither a listed culpable mental state, is not defined in the penal code, see V.T.C.A., Penal Code, § 6.03, which lists and defines the various culpable mental states, does not need to be defined, see *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983), also see *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App.1977), *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980), and *Fearance v. State*, 620 S.W.2d 577, 584 (Tex.Cr. App.1980), and is not linguistically equivalent to either intentionally or knowingly, see *Heckert v. State*, 612 S.W.2d 549 (Tex. Cr.App.1981), it is, nevertheless, in common parlance, "the thought process which embraces more than a will to engage in conduct and activates the intentional conduct." *Fearance*, supra, 620 S.W.2d at 584. Judge Clinton, in the dissenting opinion that he filed in *Russell*, supra, pointed out that "Moreover, virtually every member of this Court has at one time or another confronted a record of capital voir dire examination in which either the trial judge or prosecutor informs a veniremember that 'deliberately' means the same thing as 'intentionally.' " (783).

In this instance, we do not find that it is necessary to involve ourselves in or engage in the ongoing controversy whether the word "deliberately" has now obtained a technical or special meaning, and thus should be expressly defined in the punishment charge of a capital murder case, see the concurring opinion that Clinton, J. filed in *Russell v. State*, supra, because, based upon the facts of this case, see supra, assuming arguendo that the jurors were misled into believing that appellant did not have to "deliberately" cause the death of Granado before they could answer special issue number one in the affirmative, the facts are overwhelming that the jury could have easily found that appellant himself intentionally caused the death of Granado by shooting him in the head with his pistol. There is also overwhelming evidence that appellant, with others, planned the robbery, and, lastly, there is overwhelming evidence that in committing the aggravated robbery of Granado appellant did not intend to leave any live witnesses after the robbery had been committed. Thus, we find that based upon the evidence a rational trier of fact could have easily found that appellant not only "caused the death of the deceased deliberately and with the reasonable expectation that the death of the deceased would result in the course of the commission of the aggravated robbery of Granado", but could have very easily found that appellant's conduct was deliberate. Therefore, albeit implicitly, when the jury found appellant guilty of capital murder, it actually found that he acted deliberately in the commission of the robbery-murder of Granado.

Appellant's fifth and sixth points of error, that V.T.C.A., Penal Code, § 19.03, when used in conjunction with V.T.C.A., Penal Code, § 7.02, is unconstitutional, are overruled.

Having carefully reviewed all of appellant's points of error that he presents for review, and finding that none rise to the level of reversible error, we affirm the trial court's judgment of conviction and sentence of death.

ONION, P.J., and DAVIS, CLINTON, MILLER, CAMPBELL and DUNCAN concur in result.