Scott Aaron **BELL**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 09–95–284 CR.

Court of Appeals of Texas,
Beaumont.

Submitted April 3, 1997.

Decided July 9, 1997.

Gaylyn Leon Cooper, Bernsen, Jamail & Goodson, Beaumont, for appellant.

Tom Maness, Criminal District Attorney, John R. DeWitt, Assistant Criminal District Attorney, Beaumont, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

A jury convicted appellant for having committed the felony offense of Murder. At the punishment phase, the jury rejected appellant's request for probation and assessed his sentence at confinement in the Texas De-

partment of Criminal Justice—Institutional Division for a term of thirty (30) years. Appellant raises four points of error for our consideration. Each point of error focuses in one way or another on a portion of the State's cross-examination of appellant's mother, Jessie Bell, which took place during the punishment phase of the trial.

The record reflects that Ms. Bell was the last of eight witnesses called by appellant at the punishment phase of the trial. The general tone of all of the witnesses' testimony, which included that of appellant himself, involved the suitability of appellant for community supervision, as opposed to penitentiary time. Said testimony elicited opinion evidence on appellant's personal suitability, as well as the fact that he had a virtual "safety net" of family and friends to aid him in complying with the terms and conditions of community supervision. The parties direct our attention to the following cross-examination testimony of Ms. Bell:

*CROSS–EXAMINATION*

(BY [THE STATE]):

Q. Ms. Bell, how are you?

A. Fine.

Q. Ms. Bell, you were in the courtroom yesterday when the jury returned the verdict, were you not?

A. Yes, I was.

Q. You were in the courtroom after the jury left, weren't you?

A. Yes, I was.

Q. And you observed what went on in this courtroom after the jury left, didn't you?

A. Sure did.

Q. Pretty sad, wasn't it?

[Trial Counsel]: Your Honor, I object to this as being immaterial and irrelevant. And as far as Scott Bell himself is concerned, it has no bearing on these proceedings, punishment.

THE COURT: Overruled.

[Trial Counsel]: Also hearsay, Your Honor.

THE COURT: Overruled.

(By [The State])

Q. Did you express an opinion to me, or was that somebody else?

A. I don't recall.

Q. Did you call me a name?

A. No, I did not.

Q. Did you hear someone else call me a name?

A. I was out of the courtroom. I did not hear a name.

Q. Did you hear this jury talked about?

[Trial Counsel]: Your Honor, I object. She said she was out of the courtroom. Also calling for a hearsay response.

THE COURT: Overruled. She said she heard some things. Overruled.

Find out what she heard, Mr. [State's Attorney].

(By [The State])

Q. What did you hear said about this jury?

A. That it was an all white jury—

[Trial Counsel]: (Interrupting) Pardon me. I object to the question and the response as calling for a hearsay response on the part of this lady right here. Without naming who said it, where did it come from, et cetera, et cetera, it is immaterial and irrelevant to whether or not Scott Bell will be rehabilitated.

THE COURT: She already answered the question. Overruled.

[Trial Counsel]: Pardon me. Is that the basis of your ruling, Your Honor, that she already answered the question?

THE COURT: Part of it. The rest of it's overruled.

[Trial Counsel]: Thank you, Your Honor.

(By [The State])

Q. So, would you please repeat that because defense counsel was talking over you?

A. I did hear something, yes, I did.

Q. What did you hear?

A. I heard that it was an all white jury, that it was unfair.

Q. You heard it was prejudice?

A. I didn't hear the word "prejudice"; but it goes with that, I'm sure.

Q. Who said that?

A. I really don't remember because I had left out. I was on the way out.

Q. How do you feel about this jury's verdict?

A. How do I feel about this jury?

Q. Yes, ma'am. Do you feel the same way as that comment?

A. Well, in a way I do, in a way I do because I always thought it was supposed to be different, you know. Maybe I'm wrong but I always thought it was 50/50, but I could have been wrong about that.

Q. What's the race of this man right here?

A. He's black.

[The State]: That's State's Exhibit No. 2.

[Trial Counsel]: Your Honor, I object to this line of questioning. Race has no place in any proceeding in the state of Texas, Your Honor and certainly in a criminal proceeding. And I object to the prosecution injecting race and racial comments into this proceeding, Your Honor.

THE COURT: Overruled.

(By [The State])

Q. We're all, are we not, Ms. Bell, of the same color under the law?

A. It's supposed to be that way.

Q. That is what the law demands.

A. The Bible has written it that way.

Q. And there shouldn't be another separate law for people of different races, should there?

A. No, there should not be; but there is.

Q. So, what matter is it the race of your—

[Trial Counsel]: (Interrupting) Your Honor——

A. (Interrupting)

THE COURT REPORTER: Excuse me.

[Trial Counsel]: Pardon me. Rather than me jumping up and down and interrupting the proceedings with my objection, will you allow what I've stated before in this area to continue to be the basis of an objection on my part?

THE COURT: Sure.

[Trial Counsel]: Thank you, Your Honor.

(By [The State])

Q. What does it matter if the law demands that justice is blind with regard to race and with regard to all those kind of prejudices?

A. Repeat that question again. You say what does it matter?

Q. What does it matter the race of a jury if the law is blind in respect to that?

A. It just has a whole lot to do with it, I'm sure.

Q. You feel like in this case it had a lot to do with it.

A. Not exceptionally. But I just think it would be fairer.

Q. You didn't hear the name or the term "redneck" used in this courtroom after this verdict?

A. No, I did not. I was out of the room.

Q. What does that mean?

A. Well, you'd have to ask the person who said that.

Q. Who said it? Do you know?

A. I cannot say. You have to ask the one who said that.

Q. Yes, ma'am. But my question is: Who said it?

A. I really don't know.

Q. Was it a female?

A. I was not—

[Trial Counsel]: (Interrupting) Your Honor, I object. She said she didn't know.

THE COURT: I'd be glad to entertain it, but she's answering before I get a chance to hear your objection.

[Trial Counsel]: I still can make the objection, Your Honor.

THE COURT: Yes, sir.

[Trial Counsel]: If you'd rule on it.

THE COURT: The harm is already done whenever they answer the question.

[Trial Counsel]: Not necessarily, Your Honor—

THE COURT: Yes, sir.

[Trial Counsel]: You can instruct the jury to disregard the question and the response, Your Honor.

THE COURT: *But if she'd wait for you to make the objection, it would make it a lot easier; and it would run a lot smoother.*

[Trial Counsel]: Yes, sir, Your Honor.

THE COURT: Let me help you a little bit. She said she didn't know. Go to something else.

[The State]: I will withdraw the question.

■ Appellant's first point of error complains of the trial court's denial of appellant's motion for new trial. Said motion alleged, *inter alia,* the following:

In the punishment phase of the trial and in [sic] with the jury present, the Prosecutor for the State of Texas elicited in testimony statements made outside of the presence of the jury which injected into the case the racial makeup of the jury. These statements were not attributed to the Defendant. The statements were hearsay and the maker was never identified. The question and the responses were objected to and were overruled by the Court. The harm was not addressed and the testimony came in as evidence. Race has no place in such proceedings. It was not shown the Defendant held such views. The statements were that the prosecutor was a red neck and that because the jury members were all Caucasian, their verdict was unfair. These were irrelevant and immaterial in that there was no tie to the Defendant. The inflammatory nature of the statements are presumptively harmful. A new trial should be granted as a result.

At the outset, we note that the State in its brief initially relies on language taken from article 37.07, § 3(a) of the Code of Criminal Procedure stating, "evidence may be admitted as to any matter the court deems relevant to sentencing." The State, however, fails to place art. 37.07, § 3(a) in the proper context for us. The indictment reflects the offense date to be on or about March 6, 1993. Therefore, the version of art. 37.07, § 3(a) in effect on the date of the offense, and, there-fore, in effect at the time of trial, was governed by the Court of Criminal Appeals' opinion in *Grunsfeld v. State,* 843 S.W.2d 521 (Tex.Crim.App.1992). The operative language in *Grunsfeld* appears as follows:

[W]e agree with the Dallas Court of Appeals in *Grunsfeld [v. State,* 813 S.W.2d 158 (Tex.App.—Dallas 1991)] in construing article 37.07(3)(a), to provide that even if deemed relevant to sentencing by the trial court, evidence is not admissible at punishment, *unless* (1) it is permitted by the Rules of Evidence (footnote omitted), and (2) if the evidence sought to be admitted is evidence of an extraneous offense, it satisfies article 37.07(3)(a)'s definition of prior criminal record. (footnote omitted) (emphasis in original)

*Grunsfeld,* 843 S.W.2d at 523. Since none of the testimony in question appeared to involve any extraneous misconduct on appellant's part, if its admission violated a provision of the Rules of Evidence, it was error to have admitted it based upon the quoted portion taken from *Grunsfeld.*

In analyzing the scope of the punishment phase of a non-capital trial as it affects what evidence may or may not be relevant to "issues" at said phase, the Court of Criminal Appeals in *Murphy v. State,* 777 S.W.2d 44, 62–63 (Tex.Crim.App.1988)(opinion on rehearing), stated the following:

[W]e have a fixed point by which to navigate questions of relevance at the guilt phase of trial. The same is not true of the punishment phase. There, aside from certain exceptions [omitted footnote lists the following: enhancement allegations, affirmative findings, probation recommendation, release status of victim in aggravated kidnapping case], the "factfinder" does not determine the existence of discreet facts. Deciding what punishment to assess is a normative process, not intrinsically fact-bound. Because the material issue at punishment is so indistinct, relevancy of proffered evidence cannot be determined by deductive processes....

In reality, what is "relevant" to determining proper punishment is more a question of policy than of logic. In creating the separate punishment proceeding in 1965,

the Legislature clearly intended to remove the blinders inherent in a unitary trial. Unfortunately, outside of Article 37.07, § 3(a), supra, it has given no clear guidance as to what considerations should inform the jury's punishment decision.

Although the above portion taken from *Murphy* does not shed much light on how to resolve the punishment "issues" dilemma *vis a vis* what evidence is or is not relevant, it is clear that any analysis of the admissibility of punishment phase evidence must initially determine whether the evidence is relevant or not. With regard to suitability for probation evidence, *Murphy* is very informative. The *Murphy* plurality held that suitability for probation, or the ability of a defendant to successfully abide by the terms and conditions that might be imposed upon him as a probationer, is not at issue for the jury in the punishment phase of trial. *Id.* at 66. This holding is elaborated upon by the Court in *Griffin v. State,* 787 S.W.2d 63, 67 (Tex.Crim. App.1990), in the following analysis:

> The mere filing of an application for probation will not authorize the State to present evidence of specific acts of misconduct on the part of the accused. Nor is it permissible for the accused, over the State's objection, to present evidence he can conform to conditions of probation. Nevertheless, the parties may open the door, in effect agreeing to make "suitability" for probation a consideration for the jury, thereby consenting "to admission of specific acts of conduct to inform the jury's discretion in deciding ... whether to recommend probation." [*Murphy* ] at 67. (citations omitted)

■ In *Griffin,* much like what occurred in the instant case, the defendant tendered witnesses who "pledged" their support to him in his attempt to follow terms and conditions of probation, and took the stand himself to assert he could, in fact, abide by those terms and conditions. By doing this, the *Griffin* Court held that the defendant placed his suitability for probation in issue. By not objecting to this testimony, the State was permitted to broach the same subject matter in somewhat greater detail on cross-examination. *Id.* at 67. In the instant case, because appellant presented testimony from family and friends of their ability to help him abide by the conditions for community supervision, he opened the door to the State's inquiry into, among other things, the opinions held by these same family members and friends regarding the criminal justice system in general, and the circumstances surrounding appellant's trial in particular. It is not difficult to see how such testimony elicited by the State would meet the definition of "relevant evidence" under TEX.R.CRIM. EVID. 401, as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Certainly without it, the jury would be presented with a rather one-dimensional picture of the environment appellant intended to occupy under community supervision.

A careful inspection of the cross-examination testimony of Ms. Bell set out above shows that the State questioned her on her opinions and attitudes regarding a number of things. However, the State's attempt to elicit testimony from Ms. Bell as to "what she heard" regarding any allegations of racial prejudice on the part of the jury or the prosecutor was not relevant in the manner in which it was elicited, and the trial court erred in admitting her subsequent responses over appellant's timely objections. Had the State established that the individuals responsible for the post-verdict comments involving racial prejudice were indeed members of appellant's "safety net" of family and friends who pledged their help with appellant's community supervision responsibilities, then the proper nexus would have been established between the comments and appellant. As the record clearly indicates, however, Ms. Bell denied making any of the comments and did not know who did. Nevertheless, the State was permitted [1] to elicit what certainly may be described as racially charged testi-

---

1. The record reflects that the trial court expressly directed the State to, "[f]ind out what she heard, Mr. [Prosecutor]."

mony from Ms. Bell which had, at that point in the trial, absolutely no connection to appellant or any of appellant's witnesses. The fact that Ms. Bell may have heard the jury or the prosecutor referred to as "prejudiced" or "redneck," or that she heard someone comment that the verdict was unfair because of the fact that the appellant was Black and the jury was entirely white, without having *first* connected the source of said comments to appellant's family or friends, was simply irrelevant as to any issue regarding appellant. As observed in *Contreras v. State,* 915 S.W.2d 510, 519 (Tex.App.—El Paso 1995, pet. ref'd), relevancy is not an inherent characteristic of any item of evidence but exists as a relation between an item of evidence and a matter properly provable in the case. We hold, therefore, that the testimony elicited from Ms. Bell, over trial counsel's timely objections, involving unidentified derogatory racial comments, was not relevant to appellant's suitability for community supervision at that point in the trial, and the trial court erred in admitting said testimony in violation of TEX.R.CRIM. EVID. 402.

■ Having found error, we must reverse the judgment as to punishment unless we find beyond a reasonable doubt that the error made no contribution to appellant's punishment. TEX.R.APP. P. 81(b)(2). This rather simple statement in the rules has evolved, or, perhaps, devolved for appellate review purposes, into whether, after examining the record as a whole, there is a reasonable possibility the evidence complained of might have contributed to appellant's punishment. *See Denton v. State,* 920 S.W.2d 311, 312 (Tex.Crim.App.1996), and *Booker v. State,* 929 S.W.2d 57, 66 (Tex.App.—Beaumont 1996, pet. ref'd). According to *Denton,* the reviewing court is to apply the correct legal standard and consider the relevant factors outlined in *Harris v. State,* 790 S.W.2d 568, 584–589 (Tex.Crim.App.1989). To properly conduct a harm analysis, the reviewing court should:

> [E]xamine [1] the source of the error, [2] the nature of the error, [3] whether or to what extent it was emphasized by the State, and [4] its probable collateral implications. Further, the court should consid-

er how much weight a juror would probably place upon the error. In addition, the court must also determine whether declaring the error harmless would encourage the State to repeat it with impunity. In summary, the reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making. . . .

*Harris,* 790 S.W.2d at 587. Accordingly, "[t]he question under Rule 81(b)(2) is not whether the error was so harmful as to require reversal. Rather, the question is whether the State, as beneficiary of the error, can persuade us to a level of confidence beyond a reasonable doubt that the error made no contribution to [appellant's punishment]." *Miles v. State,* 918 S.W.2d 511, 517 (Tex.Crim.App.1996) quoting *Alba v. State,* 905 S.W.2d 581, 593 (Tex.Crim.App.1995) (Clinton, J., dissenting).

When conducting a harm analysis, we look at the totality of the record. *Miles,* 918 S.W.2d at 517. As an appellate court, we calculate as much as possible the probable impact of the error on the jury in light of the existence of the other evidence. *Id.; Harris,* 790 S.W.2d at 587. In making the analysis, the predominant concern is the error and not whether there is overwhelming evidence to support the appellant's guilt. *Id.* If a reviewing court rules that an error is harmless it is in essence asserting that the nature of the error is such that it could not have affected the jury. *Id.*

In the instant case, the source of the error was the State and its decision to conduct the inquiry regarding the derogatory comments in the presence of the jury without first connecting said comments to any of the family and friends in appellant's community supervision "support group." The nature of the error was to place before the all-white jury the fact that one or more individuals had remarked that the guilty verdict was racially motivated; that one or more individuals also remarked that the verdict was unfair because the jury was all-white; that the word "redneck" was used by someone in reference to either the prosecutor or the jury; that the State implied by its questions to appellant's

mother that members of appellant's family or friends were responsible for the remarks; and that the State failed to present any evidence tying the remarks in question to any specific individual, much less to anyone connected to appellant.

With regard to any emphasis the State placed on the erroneously admitted testimony, we were able to locate only the following rather veiled reference to it in the State's closing argument:

[The State]: And what I meant to say is that I'm sure you've noticed that a punishment hearing has all to do about the defendant, the defendant, the defendant. Mr.[Trial Counsel] in his closing argument did not say Johnny Ransom [the victim] one time. I waited for him to. And he didn't, not once. He wanted to scold me because I wanted to tell you folks the kind of environment that he wanted you to send him back to, see.

[Trial Counsel]: Your Honor, I object to that attack on me personally. It is outside the record; and it is also an improper attack, Your Honor.

THE COURT: Overruled.

[The State]: See, because this man wants his client to get probation—he wants probation—so that he can go home and rehabilitate himself and spend time with his mother and his family . . . .

Admittedly, there is not much emphasis placed on the erroneous testimony by the State. However, it is the next factor that concerns us most; the probable collateral implications of the erroneous testimony on the jury. We believe that anyone with only the most rudimentary understanding of human nature would generally agree that people usually respond to criticism negatively to a greater or lesser degree. The degree of negativity that a person experiences is a function of the specific criticism voiced, the spirit in which it is voiced, and who is voicing it. When the criticism consists of accusations of the lack of integrity on the part of an all-white jury regarding its verdict, based upon racial prejudice, and the source of the accusations is never identified but presumed to be linked to a Black defendant merely because the accusations have, customarily,

been stereotypically connected with those of the defendant's race, can we say that the erroneously admitted accusations were "harmless" in that they "could not have affected the jury?"

In a similar vein, any analysis of the amount of weight a juror would probably place on the erroneous testimony would have to factor in the strong emotional aspect inherent in accusations of racism. Of no small significance is the fact that the erroneous testimony was closely intertwined with the otherwise relevant testimony of Ms. Bell's personal opinion of the verdict and the trial process, thus possibly tying the racially charged comments to appellant's mother for the simple reason that she was a witness to the post-verdict events of the previous day. It is certainly reasonable to infer that any negative opinions held by Ms. Bell, whether based firmly on her testimony or merely raised through innuendo, as to the jury and its verdict, would be likely to have a negative effect on appellant. Because the relevant opinion testimony and the erroneous innuendo were elicited in such close proximity to each other, we believe it would have been difficult for the average juror to have treated each as anything but equally probative with regard to the issue of suitability for community supervision.

Finally, whether or not the State would be encouraged to repeat the error with impunity, should we declare the error harmless, is difficult to assess. The error consisted essentially of the State eliciting irrelevant, racially charged testimony from a witness in the presence of the jury. In this case, however, the unique setting and circumstances at which time the erroneous testimony was elicited are of equal importance in the harm analysis. It is a repeated line of inquiry by the State under the same or similar trial conditions that we would want to avoid in the future. We are not so naive in believing that an adverse ruling would result in a complete end to irrelevant questions generally.

We find, therefore, that under the particular set of events present in the record of the punishment phase of the trial, we cannot say that, beyond a reasonable doubt, the error

made *no* contribution to appellant's punishment. Appellant clearly qualified for probation. The jury assessed him thirty years. Self-defense was hotly contested by the parties during the guilt/innocence phase. Although appellant's evidence on the issue was mostly inconclusive, it appears that the victim may have initiated the final confrontation by physically pushing appellant off his (victim's) front porch.

Further support for our decision that the error was harmful to appellant comes from the fact that the State's appellate brief does not entertain the possibility that the trial court's ruling was erroneous. As pointed out above, the State, as beneficiary of the error, was required to persuade us beyond a reasonable doubt that the error made no contribution to appellant's punishment. *Miles,* 918 S.W.2d at 517. In refusing to recognize even the possibility of trial court error, the State has failed to meet its burden.

For all of the reasons discussed above, we sustain appellant's first point of error and reverse that portion of the trial court's judgment which imposes punishment, and we remand the cause to the trial court for a new hearing solely on the issue of punishment. TEX.CODE CRIM. PROC. ANN. art. 44.29(b) (Vernon Supp.1997). Because we sustain point of error one, we do not reach the remainder of appellant's points of error, none of which complain of the lack of legally sufficient evidence to sustain the conviction.

REVERSED AND REMANDED.