In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00122-CR


______________________________




DOSHEE SWAN TOWERY, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 102nd Judicial District Court


Bowie County, Texas


Trial Court No. 07F0058-102




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 A Bowie County jury found Doshee Swan Towery (referred to as Defendant) guilty of the
murder of Phillip Stanley, see Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003), and assessed
punishment at fifty years' imprisonment. The trial court entered judgment on the verdict. We affirm
that judgment.

 During the trial, the State introduced evidence that the Defendant, while in jail awaiting trial,
had handwritten the date of Stanley's murder and the words "forgive me" over a passage in his
jailhouse Bible:

 He that smiteth a man, so that he die, shall be surely put to death. 

 And if a man lie not in wait, but God deliver him into his hand; then I will appoint
thee a place whither he shall flee. 


Exodus 21:12-13 (King James). Towery trusts that he has now found a way to the place whither he
may flee: the trial judge's apparently inadvertent written grant of Towery's motion for directed
verdict of acquittal prior to receipt of the jury's verdict.

 The Defendant urges three points of error: (1) that the court had no jurisdiction to impliedly
vacate the grant of acquittal, submit the charge to the jury, and enter judgment on the guilty verdict
because, he asserts, jeopardy attached at the moment of acquittal and the court lost jurisdiction to
subsequently enter judgment on a guilty verdict; and (2) that his right as a defendant to a fair trial
was violated under the Federal and Texas Constitutions (1) when the jury was tainted by a dismissed
juror's comment. 

I. FACTS

 The evidence of the Defendant's guilt is convincing.

 A heated dispute between the Defendant and Stanley (who knew each other through past drug
dealings) came about because the Defendant's younger brother insulted Stanley's girlfriend. 
Witnesses saw the Defendant shoot Stanley three times and kill him, and then flee in his car. While
fleeing, the Defendant had an automobile collision; witnesses at the scene of the accident saw him
toss a gun from his car. Ballistics testing matched the gun thrown from the car to the bullets that
killed Stanley. At trial, the Defendant's defense posture was that another person had shot Stanley
and then placed the gun in the Defendant's automobile. 

II. FIRST POINT OF ERROR: ENTRY OF DIRECTED VERDICT

 A written motion for directed verdict was filed with the court on March 20, 2007, along with
seventeen other motions, most of which concerned discovery. (2) At the June 25 pretrial hearing, the
court reviewed discovery issues with the parties. At that time, the trial court commented that "the
only motions that are still pending before this Court, there is what we call a motion in limine. . . .
All right, gentlemen, are there any other motions?" The State responded that it would present a
formal motion in limine. The court then stated to defense counsel: 

 your motion -- you had the prefix [sic] motion that was presented. If you will confer
with [the State] those matters that can be agreed upon, I want those removed from the
case. And likewise, the only thing I'll be interested in hearing are those issues in
controversy that I need to make a ruling on.

 

The Defendant consented and both sides indicated they had no further motions to present. 

 At some point on June 25, the trial judge signed orders granting thirteen of the motions filed
by the Defendant on March 20: nine discovery motions and four nondiscovery motions. 

 The following day, before beginning voir dire, the trial court inquired of the parties if there
were any motions that needed resolution before commencing. The State responded by presenting
a motion in limine and addressing several of the Defendant's discovery motions and the Defendant's
motion for continuance. The Defendant agreed that the State had provided all requested discovery
and commented, "I do have a number of motions that have attached orders to them. For the purpose
of the record I would request that the Court sign those orders, indicating that they have been granted,
and make those a part of the record." The court responded, "All right."

 The Defendant then responded to the State's motion in limine; the court granted that motion,
after which the following exchange occurred: 

 [Defense Counsel]: And for purposes of this hearing I do have all of my
motions and the proposed orders.

 

 THE COURT: All right.

 

 [Defense Counsel]: I would submit that to the Court now, and respectfully
request, based upon what the State has represented and what the State has done, that
they all are in fact granted, based upon what has been produced to the defense.


 THE COURT: All right. Anything further, gentlemen?


Following this exchange, the Defendant argued for a continuance, which was denied. 

 A. Trial

 After the June 25 exchange, voir dire was conducted; the case-in-chief began the next day
and continued through the following day. After a lunch break on June 27, outside the presence of
the jury, and after the State had indicated it would have no more witnesses but had not yet rested,
the following exchange occurred:

 [Defense Counsel]: . . . after the State rests, then the defense would have a
motion to make, and would like to call the defendant outside the presence of the jury
concerning whether he intends to testify or not.


 THE COURT: All right, let's call him right now. The record is going to
reflect that your motion is timely presented.


 [Defense Counsel]: All right. My motion would be for an instructed verdict.


 THE COURT: You have reduced to writing such a motion.


 [Defense Counsel]: Yes, I have.


 THE COURT: And I do have the written motion, as well.


 [Defense Counsel]: All right, sir.


 THE COURT: So it is of record.


 [Defense Counsel]: Thank you, Your Honor.


 THE COURT: What I will do is put it in the proper sequence when the State
rests.


Once the jury returned from lunch, the State rested and there was no further mention of the motion
for directed verdict. On this same date, the defense put on its case, the jury was charged, and
arguments were presented; the jury retired to consider its verdict, deliberating about two hours, after
which the jurors were recessed for the night. 

 However, at some point in time on June 27, the trial judge signed an order which purported
to grant the Defendant's motion for a directed verdict, the order specifically stating that the motion
was heard on that day and ordering the entry of a finding of not guilty. No other orders dated June
27 were entered. The jury resumed deliberation on June 28 and returned with a finding of guilty. 

 The trial then went into the punishment phase. Evidence was taken, arguments were made,
a charge was presented to the jury, and the jury assessed punishment at fifty years' confinement and
a fine of $10,000.00. On June 28, the trial judge signed the judgment of conviction. 

 B. Post-Verdict

 All of the thirteen orders which had been signed June 25, together with the order granting a
directed verdict dated June 27, were filed with the clerk on June 28, between 4:34 and 4:37 p.m. (3) 
After briefing had been submitted in this appeal (after the trial court had lost its plenary power over
the case), the trial court forwarded a supplemental clerk's record containing Judge John Miller's
January 22, 2008, letter to the trial court clerk. In that letter, Judge Miller asserted that the grant was
inadvertent. At that point, the only "correction" or retraction of the order granting an instructed
verdict of acquittal contained in the appellate record was this letter. As a result, as the record then
existed, it contained conflicting judgments: the order of acquittal and the judgment of conviction. 

 In considering the means to resolve this very apparent conflict, we turned to Rule 44.4, which
provides:

 (a) Generally. A court of appeals must not affirm or reverse a judgment
or dismiss an appeal if:

 (1) the trial court's erroneous action or failure or refusal to act
prevents the proper presentation of a case to the court of appeals; and

 (2) the trial court can correct its action or failure to act.

 (b) Court of Appeals Direction if Error Remediable. If the circumstances
described in (a) exist, the court of appeals must direct the trial court to correct the
error. The court of appeals will then proceed as if the erroneous action or failure to
act had not occurred.


Tex. R. App. P. 44.4. The more common application of this rule is when a trial court has refused to
provide factual findings or hear some kind of evidence (e.g., not hold a Batson (4) hearing or accept
defendant's offer of proof) so that the record may be perfected before proper review may be had. See
LaPointe v. State, 225 S.W.3d 513, 521 (Tex. Crim. App. 2007). But, in a recent case, the Texas
Court of Criminal Appeals applied Rule 44.4 to abate a case in which the trial court had both granted
defendant's motion for new trial and certified defendant's right to appeal. See Taylor v. State, 247
S.W.3d 223, 224 (Tex. Crim. App. 2008). In Taylor, the court determined that the appeal must be
abated and the trial court ordered to clarify which action was intended. Id.

 C. Case Abated 

 Faced with the conflicting orders of acquittal and conviction, this Court abated the matter on
May 28 and returned it to the trial court for the purpose of having the trial court address the
circumstances surrounding the presentation and signing of the directed order of acquittal and the date
and approximate time of the entry of that order. The abatement order also directed the trial court that
if the instructed verdict of acquittal had been entered through mistake or inadvertence, it was to
correct the record so that it reflected the truth of the matter, after which a supplement to the record
would be returned to this Court. 

 In response to the order of abatement, the trial court held a hearing on May 22, 2008, and,
as a result of that hearing, the trial court entered its "Order Nunc Pro Tunc" dated June 4, 2008. That
nunc pro tunc order makes a finding that the June 27, 2007, order for instructed verdict had been
granted incorrectly through clerical error; it then proceeds to correct the order dated June 27, 2007,
nunc pro tunc to reflect the motion for instructed verdict as being "denied." (5) The trial court's order
then reiterates the correctness of the judgment of conviction dated July 9, 2007.

 D. Analysis

 1. STANDARD OF REVIEW

 The question of whether a person has been acquitted is a question of law. See Smith v.
Massachusetts, 543 U.S. 462, 468-69 (2005); United States v. Martin Linen Supply Co., 430 U.S.
564, 571 (1977). An acquittal occurs when a ruling, whatever its label, actually resolves, in
defendant's favor (whether correctly or not) some or all of the factual elements of the offense
charged. Martin Linen Supply, 430 U.S. at 571.

 2. OVERVIEW OF DIRECTED VERDICTS

 "No person, for the same offense, shall be twice put in jeopardy of life or liberty, nor shall
a person be again put upon trial for the same offense, after a verdict of not guilty in a court of
competent jurisdiction." Tex. Const. art. I, § 14; see also U.S. Const. amend. V; Tex. Code Crim.
Proc. Ann. art 1.10 (Vernon 2005). The federal Double Jeopardy Clause "prohibits reexamination
of a court-decreed acquittal to the same extent it prohibits reexamination of an acquittal by jury
verdict." Smith, 543 U.S. at 467. 

 The one exception to this rule against reexamination, in the federal scheme, is the
government's ability to appeal a post-guilty-verdict directed acquittal for reinstatement of the jury's
verdict. Id. But in Texas, an acquittal from the grant of a directed verdict is not an order from which
the State has an appeal; it is "well settled that a verdict of acquittal can not be reviewed regardless
of how egregiously wrong the verdict may be." State v. Moreno, 807 S.W.2d 327, 332 n.6 (Tex.
Crim. App. 1991) (citing United States v. Sisson, 399 U.S. 267, 289-90 (1970) (acquittal through
directed verdict)).

 However, this rule against reexamination only applies to acquittals that are in fact final. See
Smith, 543 U.S. at 470. (6) A mid-trial acquittal may be nonfinal if nonfinal treatment has been "plainly
established by pre-existing rule or case authority expressly applicable to midtrial rulings on the
sufficiency of the evidence." Id. at 473. The Court noted that some states do not accord finality to
directed verdicts of acquittal until signed and entered in the docket (Georgia), until a formal order
is issued (Washington), or until completion of the hearing (Florida). Id. at 471. The Court held that
if, "after a facially unqualified midtrial dismissal of one count, the trial has proceeded to the
defendant's introduction of evidence, the acquittal must be treated as final" unless the pre-established
state law statute, rule, or case provides otherwise. Id. at 473.

 In Texas, there is no such statute, rule, or case. Indeed, there is no statutory procedure even
governing a directed verdict of acquittal in most criminal matters. But see Tex. Code Crim. Proc.
Ann. art. 38.17 (Vernon 2005) (where requirement of two witnesses, or one witness plus
corroboration, is not fulfilled, "the court shall instruct the jury to render a verdict of acquittal, and
they are bound by the instruction"); and see Tex. Code Crim. Proc. Ann. art. 1.27 (Vernon 2005)
(where code does not provide rule of procedure, common law shall be applied and governs). 
Without a "plainly established" and "expressly applicable" rule allowing reconsideration of a directed
acquittal, it appears that, in Texas, if one considers Smith to be controlling, a mid-trial acquittal may
not be reconsidered.

 But the court's holding in Smith is distinguishable on two grounds: (1) it addresses a partial
acquittal; and (2) it rests on a principle not applicable here: reliance. See Smith, 543 U.S. at 472-73. 
That is, that double jeopardy must bar reconsideration of the acquittal because a defendant relies on
the acquittal on one count in the way he presents his evidence on the remaining counts. Here, the
record contains no indication that anyone--Defendant, State, or the court itself--was aware the
acquittal had been granted, let alone relied on.

 Indeed, the Court stated, "Double-jeopardy principles have never been thought to bar the
immediate repair of a genuine error in the announcement of an acquittal." Id. at 474. This Court has
previously stated in dicta that an acquittal by directed verdict is immediate. See Todd v. State, 242
S.W.3d 126, 136 (Tex. App.--Texarkana 2007, pet. ref'd); see also Tex. Code Crim. Proc. Ann.
art 37.12 (Vernon 2006). As a general rule in Texas, an acquittal through directed verdict is
immediate, is accorded finality, and renders the question of guilt no longer at issue. See Sisson, 399
U.S. at 289-90; Moreno, 807 S.W.2d at 332 n.6; Todd, 242 S.W.3d at 136. 

 We note, then, that if the act of signing the judgment of acquittal was indeed effective, the
remaining part of the trial (wherein the Defendant was found guilty and sentenced) would be a
nullity. 

 Although we have found no Texas authority directly on point regarding directed verdicts of
dismissal, other jurisdictions have wrestled with similar issues. An intermediate appellate court in
Maryland held that the trial court's inadvertent (and almost immediately corrected) oral grant of a
directed verdict on one of three charged counts was simply a "slip of the tongue" that did not result
in "actual resolution of the sufficiency issue" and did not, therefore, implicate double jeopardy. Allen
v. State, 850 A.2d 365, 372 (Md. Ct. Spec. App. 2004). On the other hand, also in Maryland, that
state's high court held that where judicial reasoning was articulated in support of the entry of
acquittal, (7) no matter how incorrect, and no matter how immediately reconsidered, double jeopardy
had attached. Pugh, 319 A.2d at 545. The court noted that "where a judge 'obviously inadvertently'
says one thing when he means something else, and immediately thereafter corrects himself, a 'verdict'
would not be rendered for purposes of . . . double jeopardy." Id. (finding that judge's statement of
reason for ruling indicated it was not inadvertent). The court stated that "[o]nce a trial judge
intentionally renders a verdict of 'not guilty' on a criminal charge, the prohibition against double
jeopardy does not permit him to change his mind." Id. (emphasis added). 

 3. CLERICAL ERROR VERSUS JUDICIAL ERROR

 One must first determine if there was, indeed, a genuine instructed verdict of acquittal
entered. It appears that the process of the exercise of judicial determination by the judge is the
primary defining issue in such a circumstance. There are other circumstances in which Texas courts
have examined the subsequent withdrawal of other orders in criminal trials. 

 The action of the grant of a new trial after conviction was the subject of what was once a
touchstone case in Texas. In Matthews v. State, 40 Tex. Crim. 316, 50 S.W. 368 (1899), the
defendant had been convicted of cattle theft. The trial court first signed an order granting a new trial
and then, on the same day, rescinded the order and reinstated the previous order, observing within
the order that the new trial had been granted because the judge was "under a misapprehension of the
evidence complained of by defendant in his motion." Id. at 368. The Texas Court of Criminal
Appeals determined that the act of granting of a new trial "ought to be regarded as final . . . the court
would have no authority, after he had granted the motion for new trial, afterwards, on the same day
or on some other day of the term, to again call the case up, set the order aside granting the motion,
and overrule it." Id. at 369.

 Matthews remained guiding authority on the ability of a trial judge to supersede a previously-granted motion for new trial for over eighty years, when a slightly different circumstance arose in
English v. State, 592 S.W.2d 949 (Tex. Crim. App. 1980). In English, a visiting judge who had not
presided over the trial entered an order granting a new trial. Then, three days later, the visiting judge
wrote on the face of the order that it had been signed "inadvertently and by mistake and the order was
not intended to have any legal effect." Id. at 955. At a hearing presided over by the regular trial
judge, the visiting judge testified that (1) the order granting the new trial had been included among
a group of other documents presented to him while he was on the bench, (2) he knew nothing of the
case, (3) he did not intend to grant a new trial, (4) there had been no hearing on the motion for new
trial, and (5) he did not comprehend the effect of what he had signed. The Texas Court of Criminal
Appeals upheld the regular judge's order rescinding the order for new trial, distinguishing it from
Matthews on the basis that in Matthews, the judge had considered the merits of the motion for new
trial, granted it, and then reconsidered that course of action; in contrast, the judge in English had
made no judicial decision and the order had simply been signed in error. The court then
distinguished a "judicial error" from a "clerical error" which involved no judicial decision-making. 
Although the rationale in Matthews has been subsequently specifically disavowed, (8) the distinction
made by the Texas Court of Criminal Appeals between the change of a rational decision described
in Matthews and the entry of an order in error, lacking a judicial determination, in English is an
important factor in a review of inadvertence in the entry of an order. This inquiry as to the quantity
of judicial reasoning employed by the judge when signing an order granting a new trial (i.e., the
signed order being the written evidence of the judicial intent) appears to be the important factor to
consider. 

 It is possible to draw a distinction between the erroneous grant of a motion for new trial and
the entry of an instructed verdict of acquittal because if a valid instructed verdict of acquittal occurs,
the case is over. Once there is an acquittal, the case no longer exists and, under the circumstances
of this case, if there was a valid judgment of acquittal, jeopardy would attach.

 Absent the application of the protection against double jeopardy, a closer analogy to our
situation may be in the quashing of an indictment; after an indictment is quashed, there are then no
charges existing against a defendant. It has been determined that the entry of a written order
quashing an indictment could be corrected by the entry of a nunc pro tunc order overruling a motion
to quash the indictment if the original order was entered as the result of clerical error. Jiminez v.
State, 953 S.W.2d 293 (Tex. App.--Austin 1997, pet. ref'd). It should be noted, however, that a
record must be made at the trial level that a clerical error had been made in the entry of a written
order to quash an indictment and that such a determination cannot be inferred from the subsequent
actions of the parties in proceeding to trial nor from later oral orders denying such a motion to quash. 
Rodriguez v. State, 42 S.W.3d 181, 186 (Tex. App.--Corpus Christi 2001, no pet.).

 Both the State and the Defendant cite State v. Stanley, 201 S.W.3d 754 (Tex. Crim. App.
2006), as controlling; the Defendant places great reliance on a sentence from it: "Thus, if the order
that the trial court entered in this cause constituted an acquittal, even if erroneously, then the State
may not appeal it." Id. at 759. The Defendant maintains that once the order for a directed verdict
was signed, acquittal was fait accompli and all else which took place after that time regarding the
trial and the charges were for naught. 

 That sentence, taken out of context from Stanley, presumes that a valid order is entered. In
Stanley, the defense had repeatedly urged that a city ordinance prohibiting unlawful assembly which
underlaid the charges was unconstitutionally vague; the trial court, after consideration of the order,
concurred and dismissed the charges. There is nothing in Stanley to hint that the written order of
dismissal was the product of any clerical error but, rather, was the considered opinion of the trial
judge. The words, "even if erroneously" as employed by the Texas Court of Criminal Appeals in
Stanley refers to the possible erroneous application of legal principles by the judge, not to an
accidental entry of an order incorporating an unintended result (i.e., not the product of judicial
reasoning). In other words, the word "erroneously" makes reference to the judicial decision upon
which the ruling was based; it does not make reference to the rote act of signing the order. 

 A written order monuments, formalizes, and preserves the record of a judicial determination;
it is intended to monument the judicial decision made at the time of its entry. When a trial judge acts
pursuant to a false or mistaken conception or application of the law, such is "judicial error," not
"clerical error." Ex parte Williams, 704 S.W.2d 773 (Tex. Crim. App. 1986). In contrast to a
judicial error, a clerical error is one that did not come about as the product of judicial reasoning or
determination and is subject to being corrected. Ex parte Poe, 751 S.W.2d 873, 876 (Tex. Crim.
App. 1988); Alvarez v. State, 605 S.W.2d 615, 617 (Tex. Crim. App. [Panel Op.] 1980). The
determination as to whether an error is clerical or judicial is a question of law, and a trial court's
finding or conclusion in this regard is not binding on an appellate court. Alvarez, 605 S.W.2d at 617;
Fanniel v. State, 73 S.W.3d 557, 559 (Tex. App.--Houston [1st Dist.] 2002, no pet.); Smith v. State,
801 S.W.2d 629, 633 (Tex. App.--Dallas 1991, no pet.). 

 This clerical error was corrected by the entry of the nunc pro tunc order entered by the trial
court after abatement. "[C]orrection [by the entry of a nunc pro tunc order] can be only as to what
was done and not as to what should have been done." Ex parte Dopps, 723 S.W.2d 669, 670 (Tex.
Crim. App. 1986) (quoting Villarreal v. State, 590 S.W.2d 938, 939 (Tex. Crim. App. 1979); Chaney
v. State, 494 S.W.2d 813, 814 n.1 (Tex. Crim. App. 1973)). 

 It is axiomatic that the phrase "nunc pro tunc" means "now for then." State v. Bates, 889
S.W.2d 306, 309 (Tex. Crim. App. 1994). What is there in the record that actually shows what took
place during the trial? The exchange between the trial judge and defense counsel concerning the
proper timing of the filing of the motion for instructed verdict took place after the State had
presented its last witness at the guilt/innocence stage, but before it actually rested. The record
reflects that after explaining to the court that the defense had a motion for instructed verdict to
present, the trial court stated that it had the written motion and stated, "So it is of record. . . . . What
I will do is put it in the proper sequence when the State rests." The record contains no oral account
of the judge's ruling, but on that same day this exchange occurred, the trial judge signed an order
purporting to grant the instructed verdict. However, the events that transpired following the
presentation of the motion and the court's signing of an order conclusively show that the judge
actually denied the motion for instructed verdict, but inadvertently signed an improper order.

 Immediately after the motion was presented and on the same day that it was ruled on, the trial
continued. At the guilt/innocence stage, the defense presented its evidence, the jury was charged,
final arguments were presented, and the jury deliberated for approximately two hours before being
recessed for the night. The jury returned the next day (June 28), resumed deliberations, and returned
a verdict of guilt. The punishment trial was then conducted, the charge on punishment was
presented, final arguments were made, and the jury deliberated, assessing punishment at fifty years'
imprisonment. Following that, the trial court signed an order of conviction.

 Had the trial judge granted the motion for instructed verdict, none of the remaining two days
of trial would have taken place. An order for directed verdict concludes the case; the
defendant--having been found not guilty--would have been discharged, the jury would have been
dismissed, everyone would go home, a judgment of acquittal (not conviction) would have been
entered. Instead, the Defendant was found guilty, punishment was determined, and he was sentenced
immediately thereafter. Later, a judgment of conviction was signed by the trial court. During none
of these proceedings did Towery's counsel intimate that the proceedings were improper based on an
instructed verdict of acquittal. The record conclusively demonstrates that the judicial reasoning
employed by the trial court was that the motion for instructed verdict was denied and all of the trial
participants were aware of that ruling. The error in signing the wrong order was clerical. The first
notice that the order of acquittal had been signed was after the trial had concluded, the record had
been prepared, and the conviction appealed. The nunc pro tunc order subsequently entered here
(denying the motion for instructed verdict) did nothing more than "make the record speak the truth"
regarding the judicial decision which was made during the trial. 

 This case is markedly different from those in which a change in a judgment cannot be
reconciled with the actual facts that occurred at trial. In Johnson v. State, 233 S.W.3d 420 (Tex.
App.--Fort Worth 2007, pet. ref'd), the defendant was found guilty of attempted murder but no
mention was made at the plea hearing of a deadly weapon. On the original judgment of conviction,
the word "none" was inserted concerning a deadly weapon finding. Some four and one-half years
later, the trial court entered a nunc pro tunc judgment to include a finding of the use of a deadly
weapon and found the original deadly weapon finding was originally "inadvertently omitted." Id.
at 423. In reversing this finding, the court of appeals explained there was nothing in the record
showing that a deadly weapon was part of the plea agreement; therefore, such a change was
improper. Id. at 427. By contrast here, the sequence of events and proceedings following the
presentation of the motion for instructed verdict compel us to conclude that the trial judge denied
the motion. 

 4. CONCLUSION

 We hold that the order granting a directed verdict of acquittal dated June 27, 2007, was
entered as the result of a clerical error, an error which was subsequently corrected nunc pro tunc. 

 Accordingly, we reject the Defendant's point of error concerning it.

III. POINTS OF ERROR TWO AND THREE: DISMISSED JUROR COMMENT

 The Defendant's second and third points of error concern a statement by a dismissed
veniremember. The Defendant asserts that he was denied the right to an impartial jury (because the
jury had been tainted by the statement made by the unseated veniremember) under the Federal and
Texas Constitutions. (9) 

 A. Complained-of Statement

 The record indicates that after jury selection had been completed and the seating of the jury
had taken place, the other prospective jurors were dismissed. Before exiting the courtroom, one of
the prospective and unselected jurors made the following comment: 

 [Dismissed Veniremember Richardson]: May I make a statement?

 

 THE COURT: Yes, ma'am.

 

 [Richardson]: Regarding a statement I made? I was making a statement. 
This is just another example of an all-white jury with a black man on trial . . .


 THE COURT: Ma'am! Ma'am! Ladies and gentlemen, you will disregard
the comments that were made by the juror. I must . . .

 

 [Defense Counsel]: On behalf of the defendant, move for a mistrial.

 

 THE COURT: That will be overruled. Ma'am, you may be excused.


The jury then took its oath, after which Judge Miller made some introductory remarks, including
noting that he had already given one instruction and that there may be a necessity to give other
instructions to the jury over the course of the trial. Judge Miller stated: 

 I had extended the courtesy a moment ago that has been responded to in a way that
was prejudicial in the very way it was presented. You are instructed that you shall
disregard any comment that you heard out of the jury panel. That is not evidence in
this case, nor is it to be considered for any purpose whatsoever.


 B. Preservation of Error

 The State, citing one evidence-admissibility case for the general rule that error must be
preserved, asserts that the Defendant failed to preserve error by not making an objection prior to
moving for a mistrial. The Defendant asserts that the basis of the motion for mistrial was clear. 

 The 

 traditional and preferred procedure for a party to voice its complaint has been to seek
them in sequence--that is, (1) to object when it is possible, (2) to request an
instruction to disregard if the prejudicial event has occurred, and (3) to move for a
mistrial if a party thinks an instruction to disregard was not sufficient. 


Young v. State, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). "However, this sequence is not essential
to preserve complaints for appellate review. The essential requirement is a timely, specific request
that the trial court refuses." Id. (footnotes omitted). "If an objectionable event occurs before a party
could reasonably have foreseen it, the omission of objection will not prevent appellate review." Id.
at 70. Similarly, if an instruction to disregard could not be effective, "the only suitable remedy is
a mistrial, and a motion for a mistrial is the only essential prerequisite to presenting the complaint
on appeal." Id. 

 "In accordance with Rule 33.1, a motion for mistrial must be both timely and specific. A
motion for mistrial is timely only if it is made as soon as the grounds for it become apparent." 
Griggs v. State, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007) (citations omitted).

 In this case, the objectionable event could not have been reasonably foreseen; it was not, for
example, reasonably foreseeable testimony in response to an improper question. Rather, it was an
unsolicited outburst, foreseeable by no one. Moreover, the court obviously found it objectionable
as it sua sponte instructed the panel to disregard the comment. Thus, the next sequential step, if the
Defendant believed the outburst was not curable by the instruction to disregard, was to request the
grant of a mistrial. The Defendant did this immediately; the request was timely. Moreover, the
Defendant obtained an adverse ruling. As such, any error was preserved. See Tex. R. App. P. 33.1.

 C. Scope and Standard of Review

 The scope of review is whether the court erred in not granting a mistrial. See, e.g., Young,
137 S.W.3d at 70. 

 We review a court's denial of mistrial for abuse of discretion. Archie v. State, 221 S.W.3d
695, 699 (Tex. Crim. App. 2007). A trial court abuses its discretion when its decision lies outside
the zone of reasonable disagreement. Id. "Only in extreme circumstances, where the prejudice is
incurable, will a mistrial be required." Id. (quoting Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim.
App. 2004)). In other words, we must determine whether the given instruction to disregard could
not cure the prejudice from the excused juror's outburst. 

 D. Analysis

 The Defendant presents authority that a jury may be antagonized to be prejudiced against a
defendant as a result of statements concerning alleged racial bias by the jury. See Bell v. State, 948
S.W.2d 535 (Tex. App.--Beaumont 1997, no pet.). But Bell is easily distinguishable in that: (1) the
statements in Bell were made during the course of testimony at the punishment phase of trial and
were challenged as irrelevant and hearsay under the Rules of Evidence, while here, the statement was
not from the stand and does not involve evidentiary rulings; (2) the statements in Bell were made by
the defendant's mother, while here, there is no indication of a connection or relation between the
dismissed veniremember and the Defendant by which the jurors can as readily (though
subconsciously) attribute the comments to the defendant; (3) the statements in Bell were numerous,
and in response to repeated questioning by the State over defendant's overruled objections, while
here, the statement was isolated and unsolicited; (4) since the statements in Bell were allowed over
objection, they were not mitigated by an instruction to disregard, while the jury here was
immediately instructed to disregard the statement; and (5) the statements in Bell were express
allegations of actual racial bias by the jury, while here, it was a more general, political statement,
with, at most, an implication that this jury would be prejudiced. 

 On the other hand, in this more enlightened time, one might surmise that the comment by the
excused juror could well have had the effect of focusing the jurors on the fact that the race of the
Defendant should have nothing to do with his guilt or his innocence. Nothing in the record shows
a detrimental impact on the jury panel. 

 The differences between the cases suggest that Bell is unpersuasive in finding error here. 
This case is more like that presented in Young and in Singleton v. State, No. 05-05-00687-CR, 2006
Tex. App. LEXIS 5318, at *2-3 (Tex. App.--Dallas June 22, 2006, no pet.) (not designed for
publication). In both of those cases, isolated prejudicial comments by potential jurors (in both cases,
not yet excused) were determined cured (or curable) by instruction to disregard so that denial of a
mistrial was not error. 

 There was no abuse of discretion in the trial court's having denied the mistrial, such a
decision falling within the zone of reasonable disagreement that the instruction to disregard could
cure any prejudice from the dismissed juror's statement. 

 E. Conclusion

 We reject the Defendant's second and third points of error. 

 We affirm the judgment of the trial court.



 Bailey C. Moseley

 Justice


Date Submitted: August 4, 2008

Date Decided: September 4, 2008


Publish


1. The federal and state claims were raised under separate points of error.
2. Thirteen of these motions involved discovery matters, but the motions also included a
motion to poll the jury, motion for jury list, motion to invoke witness rule, and motion to shuffle jury
panel.
3. Also file-stamped at that time is an order granting the State's motion in limine, though it
does not indicate a date on which it was signed.
4. Batson v. Kentucky, 476 U.S. 79 (1986).
5. The order incorporates by reference an order in the same form which had previously granted
the instructed verdict in which the trial court interlineated the words "Granting" and "granted" and
manually replaces them with "Denying" and "denied"; the trial court then struck through the
paragraph entering a finding of not guilty. 
6. In Smith, the United States Supreme Court considered whether a trial judge may reconsider,
before closing arguments, a ruling of acquittal made at the close of the State's case on one of the
three charges for which defendant was being tried. See Smith, 543 U.S. at 464. The trial court orally
granted defendant's oral and written motion for directed verdict made at the close of the State's case;
the judge made a written grant on the written motion. Id. at 465. After the defendant had rested, and
on the State's motion, the court "reconsidered" its earlier ruling (including doing so in writing) and
allowed that count to go to the jury. Id. at 465-66. 
7. In a trial to the court (not jury), the judge, after hearing evidence, orally ruled, "Guilty in
2110, and not guilty in 2111. I don't think it's in sufficient quantity." Pugh v. State, 319 A.2d 542,
543 (Md. 1974). Immediately on hearing the ruling, the State referenced certain evidence and the
court immediately thereafter changed its ruling.
8. Awadelkariem v. State, 974 S.W.2d 721, 728 (Tex. Crim. App. 1998) ("[T]he Matthews rule,
having always rested on questionable foundations, is no longer viable . . . .").
9. The Defendant expressly does not assert that the jury actually was racially biased, only that
the statement, in challenging the jury's racial impartiality, would/could have resulted in that jury
treating the Defendant more harshly.